*1051
 
 OPINION
 

 Per Curiam:
 

 On November 22, 1971, Paul Simpkins (“Simpkins”), a land developer, filed an application to change the manner and place of use of the water rights granted under Certificate 4663. On July 24, 1972, respondent State Engineer of Nevada (“State Engineer”) granted Permit 26358 which allowed 2.625 cubic feet per second (“c.f.s.”) for 665 acre-feet annually (“a.f.a.”) to be pumped into a proposed residential area in the Pahrump Basin. Specifically, Simpkins’ Permit 26358 stated, “The water will be used to serve approximately 204 individual metered residential lots, approximately 100 ft. x 180 ft. in size; six commercial lots ranging from 1.52 acres to 6.28 acres totaling 34.63 acres; and a 8.81 acre recreational park.” Today, this development is commonly known as Allen Estates.
 

 The permitted use was for quasi-municipal purposes, and construction was due to begin on or before January 24, 1973. Pursuant to Permit 26358, Simpkins was required to demonstrate on or before February 24, 1977, that the water was being put to beneficial use.
 
 [1]
 
 On March 21, 1977, Simpkins filed with the State Engineer his first time extension application for proof of beneficial use (“PBU”). Simpkins requested the extension because he was waiting for loan proceeds which were earmarked for water improvements. Subsequently, Simpkins requested and received two additional PBU extensions.
 

 In 1980, Simpkins formed a partnership with appellant Desert Irrigation, Ltd. (“DI”) due to financial and logistical difficulties with the water system at Allen Estates.
 
 [2]
 
 Over the following thirteen years, DI requested and received fourteen PBU time extensions. Although the basis of the requests for extensions
 
 *1052
 
 during those years is not particularly relevant to the instant matter, it is significant to note that no extension application ever referenced or discussed DI’s intent to divert uncommitted water at Allen Estates to another residential development six miles away.
 

 Together, Simpkins and DI progressed in the development of Allen Estates. The progress of their work was reflected in the numerous subdivision map filings with Nye County and requests for PBU time extensions. By March 21, 1990, the latest PBU extension application reflected that Allen Estates had eighty-four customers utilizing water and fourteen more in need of service. DI stated in its PBU time extension application that it would be another year before Allen Estates was operating at full capacity. Consequently, the request for an extension was granted.
 

 In April 1991, Reagan Morin (“Morin”) of DI had several conversations with Christine Theil (“Theil”) of the State Engineer’s office in which Theil informed Morin that DI should file an actual PBU because no more PBU time extensions would be granted. Based on these representations, DI filed a PBU on April 25, 1991. However, DI formally withdrew the PBU in a May 31, 1991 letter after seeking advice from legal counsel. DI filed its fifteenth application for a PBU time extension on May 29, 1991, which was granted by the State Engineer.
 

 On December 6, 1991, DI filed an application to change the point of diversion and place of use for permitted but uncommitted water in the Allen Estates development. DI realized that its original permitted water rights were in excess of the a.f.a. necessary to supply all units at Allen Estates. Morin stated that the reason DI filed the application was “to utilize the balance of the water rights [at Allen Estates] into another piece of property.”
 

 The property to which DI desired diversion was a 160 acre parcel of undeveloped land in the Pahrump Basin, six miles from Allen Estates. DI intended to develop the area for 1,196 mobile homes, recreational buildings, and a swimming pool. Although the diversion application was due for disposition on March 22, 1992, the State Engineer decided to withhold a determination when it received DI’s sixteenth request for a PBU time extension, filed March 13, 1992. The State Engineer’s failure to act on DI’s request to divert water from Allen Estates was also prompted by the earlier withdrawal of the April 25, 1991 PBU.
 

 The State Engineer’s investigation of the water supply at Allen Estates revealed that the amount of water permitted for use under Permit 26358 was substantially in excess of the required amount for Allen Estates to function at maximum capacity. The State
 
 *1053
 
 Engineer concluded that DI was not “proceeding in good faith and with reasonable diligence” to put the uncommitted water to beneficial use. Pursuant to NRS 533.395(1),
 
 [3]
 
 366.85 a.f.a. of DI’s 665 a.f.a. water rights were cancelled under Permit 26358. However, to ensure that DI had a sufficient supply of water regarding the undeveloped parcels at Allen Estates, the State Engineer granted DI a PBU extension for the remaining 298.15 a.f.a.
 

 DI requested an administrative hearing to appeal the cancellation. On December 16, 1992, DI presented evidence of its good faith and due diligence in developing Allen Estates. However, beyond Morin’s testimony stating that DI intended to develop the noncontiguous 160 acre parcel, no evidence of good faith and due diligence was offered with respect to that property.
 

 The absence of any evidence to develop the 160 acre parcel served as the basis for the State Engineer R. Michael Turnipseed (“Turnipseed”) to affirm the cancellation letter:
 

 The evidence and testimony regarding the progress made over the years applied only to the development of Allen Estates. In the fifteen requests for extension of time, the owner of record never mentioned any other water commitment beyond that which was required for Allen Estates. The State Engineer finds that there is no evidence or testimony on the record showing that the quantity of water beyond that which was required for Allen Estates, had ever been committed to any purpose.
 

 Turnipseed was also unpersuaded by DI’s introduction of five case studies where the State Engineer granted PBU time extensions despite the fact that not all water was committed to a use. In distinguishing the five case studies from the instant matter, Turnipseed noted that DI’s application sought diversion to property in an unapproved subdivision, six miles from Allen Estates,
 
 *1054
 
 and outside the service area approved by the Public Service Commission.
 

 DI filed a petition for judicial review of Turnipseed’s decision in the district court. DI claimed that Turnipseed’s findings were contrary to the law in light of DI’s intent to develop the 160 acre parcel. Although the district court did not reverse Turnipseed’s ruling on March 8, 1994, it remanded the matter. The district court stated:
 

 The Court rejects the arguments of [DI] save for one. . . . The Court is more troubled with the State Engineer’s failure to address whether NRS 533.380(4) should apply as to a proposed transfer of the rights to a non-contiguous parcel and to which the petitioner sought to remove the water.
 

 On remand, the State Engineer discussed DI’s efforts to put the permitted water to beneficial use in the context of NRS 533.380(4). However, the ruling only addressed DI’s work at Allen Estates. The State Engineer refused to consider DI’s claim that it intended to put the excess water to beneficial use at a development six miles from Allen Estates. Specifically, the State Engineer held that “the 160 acre parcel cannot be considered in determining whether to approve or deny the application for extension of time filed under Permit 26358.” Thus, the State Engineer affirmed its prior cancellation of the uncommitted water rights.
 

 DI again filed a petition for judicial review. On November 16, 1995, the State Engineer’s ruling was then affirmed in its entirety. The district court agreed that NRS 533.380(4) could not be read so broadly as to include a noncontiguous parcel of land situated six miles from Allen Estates. From this ruling, DI now appeals.
 

 DI argues that when it submitted its sixteenth PBU time extension application, the State failed to consider DI’s intent to develop a 160 acre parcel located six miles from Allen Estates. DI relies on the language in NRS 533.380(4)(b) which establishes the criteria the State must consider when granting or denying a PBU time extension:
 

 [T]he State Engineer shall, in determining whether to grant or deny the extension, consider, among other factors:
 

 (b) The number of parcels and commercial or residential units which are contained in or planned for
 
 the land being ■ developed or the area being served
 
 ....
 

 (Emphasis added.)
 

 In this case, DI claims that “the land being developed” is the 160 acre parcel, while “the area being served” is Allen Estates. Because the statutory language does not distinguish between
 
 *1055
 
 contiguous and noncontiguous land being developed or served, DI asserts that Turnipseed violated the mandate in NRS 533.380(4)(b) by refusing even to consider the land being developed, the 160 acre parcel.
 

 More specifically, DI interprets the disjunctive phrase, “the land being developed
 
 or
 
 the area being served,” as mutually exclusive. In other words, DI asserts that “the land being developed or the area being served” must always mean two separate and distinct parcels of land. DI reasons that if the contested statutory phrase is interpreted any other way, “the land being developed” would always subsume “the area being served” and, thus, render the “area being served” language in the statute nugatory.
 
 See
 
 One 1978 Chev. v. County of Churchill, 97 Nev. 510, 512, 634 P.2d 1208, 1209 (1981). We conclude that this argument belies the facts of the instant matter and the realities of residential development.
 

 DI admits that during the construction of Allen Estates, some residential lots were occupied while others were being built. Thus, a situation existed where land in a permitted area, Allen Estates, was simultaneously being developed
 
 and
 
 served. Therefore, DI’s assertion that the land being developed always subsumes the area being served is inaccurate.
 

 In contrast, respondent State of Nevada (“State”) argues that if the statute requires interpretation, Turnipseed correctly treated the disjunctive choices, “the land being developed” and “the area being served,” as precatory. That is, Turnipseed was free to choose either criteria in making his decision to grant or deny the PBU time extension request. We disagree.
 

 Allowing the State Engineer merely to choose between “the land being developed” and “the area being served” when making a decision to extend a PBU time application lends itself, at the very least, to an impression of capriciousness and unfairness. In Nevada, no administrative body may arbitrarily select a statutory basis for its decision.
 
 See
 
 NRS 233B.135(3)(f).
 

 We conclude that the “or” separating the two phrases, “the land being developed” and “the area being served,” means either “and” or “or,” depending on the stage of construction in the development. For example, if a development is in its early construction phase, then the only criterion appropriate for the State Engineer to review is “the land being developed.” If, however, a development has occupants but still requires additional construction of lots, the State Engineer must review both “the land being developed”
 
 and
 
 “the area being served” when granting or denying a PBU time extension.
 

 
 *1056
 
 Interpreting “or” as either “and” or “or” is an accepted practice in questions of statutory construction. “[T]here has been a great laxity in the use of terms ‘and’ and ‘or’ such that the terms are interchangeable and one may be substituted for the other . . . .” 1A C. Dallas Sands,
 
 Sutherland Statutory Construction
 
 § 21.14 (4th ed. 1985). Moreover, a strict interpretation of “or” should be avoided if it leads to a potentially dubious result. Wisconsin v. Duychak, 395 N.W.2d 795, 800 (Wis. 1986). Thus, the arguments of both DI and the State fail to resolve the central issue in this case: whether “the land being developed” includes a parcel of land
 
 outside
 
 the originally permitted area.
 

 It is well settled that when a statute is ambiguous or susceptible to more than one reasonable interpretation, this court shall endeavor to determine the legislative intent. Cleghorn v. Hess, 109 Nev. 544, 548, 853 P.2d 1260, 1262 (1993). Here, NRS 533.380(4)(b) does not indicate whether “the land being developed” includes a noncontiguous parcel of land, located outside the permitted area. Thus, we turn to legislative history for guidance.
 

 Preliminarily, we note that neither the State nor DI offers any evidence of legislative intent in their briefs.
 
 [4]
 
 However, a review of the minutes from a hearing before the Committee on Economic Development and Natural Resources reveals that the phrase “the land being developed or the area being served” refers only to parcels of land
 
 within a subdivision.
 
 While discussing the portion of Assembly Bill 16 which eventually added NRS 533.380(4)(a)-(d), senior research analyst of the Legislative Counsel Bureau, Fred Welden, explained the meaning of each proposed criteria:
 

 [NRS 533.380(4)(a)-(d)] provides that the State Engineer can give the municipal and quasi municipal uses extensions of time if they don’t prove to be beneficial uses. It gives four criteria that he must consider before he grants them an extension of time. . . .
 
 [NRS 533.380(4) (b)] speaks to the number of parcels in the subdivision,
 
 for instance if there are a great number of parcels maybe there better [sic] reasons why he could not put it to beneficial use ....
 

 Hearing on A.B. 16 before the Assembly Comm, on Economic Development and Natural Resources, 61st Leg. 0031, 0032 (Nev. February 10, 1981) (emphasis added).
 

 Based on these minutes, we conclude that the phrase “ire
 
 the
 
 subdivision” denotes a contiguous parcel of land sectioned into
 
 *1057
 
 various lots. Indeed, “subdivision” is defined as “[a] tract of land surveyed and divided into lots for purposes of sale.” Webster’s Third New International Dictionary 2274 (1971). Given this definition and the context in which the phrase is used, we cannot interpret “the number of parcels in the subdivision” so broadly as to include a noncontiguous 160 acre parcel, located six miles from the originally proposed area for water use under Permit 26358.
 

 This determination leads to the inescapable conclusion that the legislature intended “the land being developed” to mean the area
 
 within
 
 which a permittee has a right to put water to beneficial use. Since Permit 26358 did not encompass the 160 acre parcel proposed for development by DI, Turnipseed and the district court properly refused to consider the 160 acre parcel as “land being developed.”
 

 Next, DI claims that in filing its sixteenth PBU time extension application, it made the requisite showing of good faith and due diligence to justify an extension of
 
 all
 
 its permitted water rights. However, the State Engineer cancelled the portion of DI’s water rights which constituted the amount of water in excess of that necessary to operate Allen Estates at maximum capacity. We conclude that the State Engineer did not abuse its discretion.
 

 Until its most recent PBU declarations, DI was unable to present any evidence of good faith and due diligence to support a PBU time extension with regard to uncommitted water at Allen Estates. In fact, no evidence was presented for almost twenty years that DI ever considered putting the excess water at Allen Estates to beneficial use. It was not until the sixteenth PBU time extension application that DI expressed its
 
 intent
 
 to develop a 160 acre parcel of land some six miles from Allen Estates. A mere statement of intent to put water to beneficial use, uncorroborated with any actual evidence, after nearly twenty years of nonuse is insufficient to justify a sixteenth PBU extension.
 
 See
 
 People v. City of Thornton, 775 P.2d 11, 18-19 (Colo. 1989).
 

 DI incorrectly assumes that a showing of good faith and due diligence toward any amount of permitted water is sufficient to preserve
 
 all
 
 water rights under a permit. However, NRS 533.395(5) provides in relevant part, “[T]he measure of reasonable diligence is
 
 the steady application of effort to perfect the appropriation
 
 in a reasonably expedient and efficient manner under all the facts and circumstances.” (Emphasis added.)
 

 Given the fact that DI knew for several years that a significant
 
 *1058
 
 portion of water under Permit 26358 was uncommitted at Allen Estates and nothing was done for almost twenty years to put
 
 all
 
 permitted water to beneficial use, DI did not steadily pursue the perfection of its water rights under Permit 26358. No permittee “ ‘shall be entitled to the use of a quantity of water in excess of that actually needed for which the appropriation was made.’ ” Orr v. City and County of Denver, 572 P.2d 805, 808 (Colo. 1977) (quoting New Mercer Ditch Co. v. Armstrong, 40 P. 989, 992 (Colo. 1895)). Accordingly, we conclude that the State did not abuse its discretion in canceling a portion of DI’s water rights under Permit 26358.
 

 At the administrative hearing, DI presented five case studies in which applications for PBU extensions were granted. DI claims that the PBU extension applications in these cases are factually similar to DI’s sixteenth request for an extension. DI further asserts that the State’s denial amounts to disparate treatment. DI cites Bailey v. State of Nevada, 95 Nev. 378, 385, 594 P.2d 734, 739 (1979), for the proposition that the State Engineer must grant PBU time extensions to similarly situated parties when no extenuating circumstances exist. We conclude that DI’s argument lacks merit and misapprehends the holding in
 
 Bailey.
 

 First, in the context of reviewing requests for PBU time extensions,
 
 Bailey,
 
 95 Nev. at 385, 594 P.2d at 738, states that “the facts and circumstances of each case are to be considered on an individual basis, taking into account the nature of the task and the difficulties encountered.” Moreover, “even if the [agency] has failed to follow some of its prior decisions, the [agency] has not thereby abused its discretion. In Nevada, administrative agencies are not bound by stare decisis.” Motor Cargo v. Public Service Comm’n, 108 Nev. 335, 337, 830 P.2d 1328, 1330 (1992). Thus, no binding effect is given to prior administrative determinations.
 

 Second, we note that the cases offered by DI are distinguishable in one important respect. Those cases involved developments in which
 
 all
 
 permitted water was committed to a specific
 
 use from the outset.
 
 Here, DI allowed uncommitted water within Allen Estates to remain unapplied to a specific use for almost twenty years. Accordingly, we conclude that no disparate treatment occurred among DI and prior applicants for PBU time extensions.
 

 Finally, DI claims that because it holds Certificate 4663, the
 
 *1059
 
 underlying certificated base right
 
 [5]
 
 to Permit 26358, any portion of water cancelled under Permit 26358 reverts to DI’s possession. The State Engineer responds that various NRS provisions require cancelled water rights to revert to the public domain. We agree.
 

 Initially, we note that although NRS 533.395 authorizes the State Engineer to cancel permitted water rights, it fails to provide for the disposition of the cancelled water rights. NRS 534.090 states that permitted water which is
 
 forfeited
 
 or
 
 abandoned
 
 “reverts to the public.” However, both parties agree that NRS 534.090 does not apply to the instant matter because the State Engineer did not work a forfeiture nor deem an abandonment. Rather, the State Engineer
 
 cancelled
 
 DI’s permitted water rights pursuant to NRS 533.395. Thus, we are left with a narrow question of law which resolves the issue of seisin when permitted water rights are cancelled pursuant to NRS 533.395.
 

 We begin our analysis with the most fundamental tenet of Nevada water law, “[t]he water of all sources of water supply within the boundaries of the state whether above or beneath the surface of the ground,
 
 belongs to the public.”
 
 NRS 533.025 (emphasis added). Indeed, even those holding certificated, vested, or perfected water rights do not own or acquire title to water. They merely enjoy the right to beneficial use. NRS 533.030.
 

 The concept of beneficial use is singularly the most important public policy underlying the water laws of Nevada and many of the western states. In fact, the principle of beneficial use is so well entrenched in our legal lexicon that the Nevada Legislature declared almost a century ago that “[bjeneficial use shall be the basis, the measure and the limit of the right to the use of water.” NRS 533.035.
 

 Each time an individual undertakes an appropriation, the per-mittee must put the water to beneficial use or risk losing their inchoate usufructuary right. NRS 533.395. Not until the prospective appropriator fulfills the strict conditions imposed by our statutory scheme will a certificate issue for the new use. NRS 533.425. Because the language of NRS 533.395(1) does not distinguish between original permittees and those permittees with prior certificated rights, all permittees are subject to the same requirements.
 

 For those permittees, like DI, who hold a certificated water right but seek a permit to change the point of diversion, place or
 
 *1060
 
 manner of use, NRS 533.040 discusses the legal effect a change permit has on prior certificated water rights.
 

 All water used in this state for beneficial purposes shall remain appurtenant to the place of use; provided:
 

 1. That if for any reason it should at any time become impracticable to use water beneficially or economically at the place to which it is appurtenant, the right may be
 
 severed
 
 from such place of use and simultaneously transferred and become appurtenant to other place or places of use . . .
 
 without losing priority of right heretofore established
 
 ....
 

 NRS 533.040 (emphasis added).
 

 The plain language of NRS 533.040 “severs” all existing water rights under a prior certificated use. Thus, a former certificated holder must begin the water certification process anew.
 
 See
 
 Sun Vineyards, Inc. v. Luna County Wine Dev. Corp., 760 P.2d 1290, 1292-93 (N.M. 1988). Once the newly permitted use supplants the old use, the only residual interest is the right to claim the original priority date.
 

 Since the legislature expressly granted the certificated holder with the right to claim an original priority date under NRS 533.040 but chose not to grant a reversionary right should the permittee fail to show beneficial use, we are reluctant to do so because of the maxim
 
 expressio unius est exclusio alterius,
 
 the expression of one thing is the exclusion of another. Galloway v. Truesdell, 83 Nev. 13, 26, 422 P.2d 237, 246 (1967). Moreover, if we conclude that a reversionary right exists in our statutory scheme, a formula would be provided for the clever certificated appropriator to hold water rights in perpetuity when it was not being put to beneficial use. This result simply cannot be reconciled with our well-grounded policy mandating beneficial use. Las Vegas Sun v. District Court, 104 Nev. 508, 511, 761 P.2d 849, 851 (1988) (interpretation of statutes should be reasonable and avoid illogical results).
 

 Accordingly, we now hold that permitted water rights, can-celled pursuant to NRS 533.395, revert to the public domain and are available for further appropriation. This holding is consistent with the legislative pronouncements of NRS 533.025, 533.035, 533.040, 533.395, and 534.090 which we read
 
 in pari materia,
 
 giving effect to all controlling legal provisions. SNEA v. Lau, 110 Nev. 715, 718-19, 877 P.2d 531, 534 (1994).
 

 However, under the facts presented in this case, we find it manifestly unfair to uphold the State Engineer’s partial cancellation of DI’s water rights. In 1979, Morin went to the State Engineer’s office specifically seeking advice regarding protection
 
 *1061
 
 and perfection of all its permitted water rights. In response, Brian A. Randall (“Randall”), an engineer in the State Engineer’s office, dispatched a detailed missive to Morin discussing several scenarios under which DI could establish beneficial use. In conclusion, Randall noted:
 

 In the event Proof of Beneficial Use is not timely filed under Permit 26358 by the current deadline established, the permit will be cancelled for failure to comply with the terms of the permit.
 
 In that case, the water rights allowed under Permit 26358 would revert to Certificate 4663, which is a certificate for irrigation use.
 
 Before water could then be used for service to a quasi-municipal development a new permit would be required to change the manner and place of use.
 

 (Emphasis added.)
 

 Randall’s representations are consistent with an internal policy memorandum of the State Engineer’s office obtained by DI. The memorandum, drafted in 1971 and reviewed in 1987, contains diagrams unequivocally illustrating that cancelled water rights revert to the holder of the underlying certificated base right. The State Engineer does not argue, nor does it cite any evidence in the administrative record, that the representations made to DI were ever inaccurate or repudiated. Thus, DI proceeded to perfect its appropriation on the specific representation that if it failed, the cancelled water rights would revert to its irrigation certificate.
 
 [6]
 

 In
 
 Bailey,
 
 we stated that “the State Engineer has been charged with the statutory duty of administering the complex system of water rights within the state. We believe that lay members of the public are entitled to rely upon its advice as to the procedures to be followed under the state water law.”
 
 Bailey,
 
 95 Nev. at 382, 594 P.2d at 737. Accordingly, we remand this matter to the district court. On remand, the district court shall instruct the State Engineer to allow DI the opportunity to put the cancelled water rights under Permit 26358 to beneficial use.
 
 [7]
 

 [1]
 

 Nevada, like most western states, is a prior appropriation state. An appropriative right “may be described as a state administrative grant that allows the use of a specific quantity of water for a specific beneficial purpose if water is available in the source free from the claims of others with earlier appropriations.” Frank J. Trelease & George A. Gould, Water Law Cases and Materials 33 (4th ed. 1986).
 

 [2]
 

 On January 18, 1983, Simpkins quitclaimed Permit 26358 to DI.
 

 [3]
 

 In pertinent part, NRS 533.395(1) states:
 

 If, at any time in the judgment of the state engineer, the holder of any permit to appropriate the public water is not proceeding in good faith and with reasonable diligence to perfect the appropriation, the state engineer shall require the submission of such proof and evidence as may be necessary to show a compliance with the law.
 
 If, in his judgment, the holder of a permit is not proceeding in good faith and with reasonable diligence to perfect the appropriation, the state engineer shall cancel the permit, and advise the holder of its cancellation.
 
 The failure to provide the proof and evidence required pursuant to this subsection is prima facie evidence that the holder is not proceeding in good faith and with reasonable diligence to perfect the appropriation.
 

 (Emphasis added.)
 

 [4]
 

 Indeed, DI claims that none exists.
 

 [5]
 

 An “underlying certificated base right” refers to the original certificate granted by the State after a party perfects a water right appropriation. In this case, DI’s underlying certificated base right to Permit 26358 is Certificate 4663.
 

 [6]
 

 The State Engineer repeatedly asserts that DI knew all along the permitted water rights were subject to cancellation, and therefore, DI should not be surprised that it completely lost its rights to the formerly permitted water. This argument is not compelling. The issue in this case is not whether DI knew it would lose its permitted water rights by way of cancellation but whether, in the future, DI would ultimately retain further appropriative rights as holder of Certificate 4663.
 

 [7]
 

 We note that our decision to grant DI further time in which to prove beneficial use is grounded in this court’s equitable powers and limited to the unusual facts of this case.
 
 See
 
 State Engineer v. American Nat’l Ins. Co., 88 Nev. 424, 426, 498 P.2d 1329, 1330 (1972).