# 131 Nev., Advance Opinion 84

## IN THE SUPREME COURT OF THE STATE OF NEVADA

EUREKA COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
NEVADA; KENNETH F. BENSON,
INDIVIDUALLY; DIAMOND CATTLE
COMPANY, LLC, A NEVADA LIMITED
LIABILITY COMPANY; AND MICHEL
AND MARGARET ANN ETCHEVERRY
FAMILY, LP, A NEVADA REGISTERED
FOREIGN LIMITED PARTNERSHIP,
Appellants,
vs.
THE STATE OF NEVADA STATE
ENGINEER; THE STATE OF NEVADA
DIVISION OF WATER RESOURCES;
AND KOBEH VALLEY RANCH, LLC, A
NEVADA LIMITED LIABILITY
COMPANY,
Respondents.

No. 61324

FILED

OCT 29 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

MICHEL AND MARGARET ANN
ETCHEVERRY FAMILY, LP, A
NEVADA REGISTERED FOREIGN
LIMITED PARTNERSHIP; DIAMOND
CATTLE COMPANY, LLC, A NEVADA
LIMITED LIABILITY COMPANY; AND
KENNETH F. BENSON, AN
INDIVIDUAL,
Appellants,
vs.
STATE ENGINEER OF NEVADA,
OFFICE OF THE STATE ENGINEER,
DEPARTMENT OF CONSERVATION
AND NATURAL RESOURCES; AND
KOBEH VALLEY RANCH, LLC, A
NEVADA LIMITED LIABILITY
COMPANY,
Respondents.

No. 63258

Consolidated appeals challenging district court orders denying judicial review of the State Water Engineer's decisions affecting water rights. Seventh Judicial District Court, Eureka County; Dan L. Papez, Judge.

*Reversed and remanded.*

Allison, MacKenzie, Ltd., and Karen A. Peterson, Jennifer Mahe, and Dawn Ellerbrock, Carson City; Theodore Beutel, District Attorney, Eureka County,
for Appellant Eureka County.

Schroeder Law Offices, P.C., and Laura A. Schroeder and Therese A. Ure, Reno,
for Appellants Kenneth F. Benson; Diamond Cattle Company, LLC; and Michel and Margaret Ann Etcheverry Family, LP.

Adam Paul Laxalt, Attorney General, and Micheline N. Fairbank, Senior Deputy Attorney General, Carson City,
for Respondents the State of Nevada Division of Water Resources and the State Engineer.

Parsons Behle & Latimer and Ross E. de Lipkau and John R. Zimmerman, Reno; Parsons Behle & Latimer and Francis M. Wikstrom, Salt Lake City, Utah,
for Respondent Kobeh Valley Ranch, LLC.

Dyer, Lawrence, Flaherty, Donaldson & Prunty and Francis C. Flaherty, Carson City,
for Amicus Curiae NV Energy, Inc.

Lewis Roca Rothgerber, LLP, and Daniel F. Polsenberg, Las Vegas; Taggart & Taggart, Ltd., and Paul G. Taggart, Carson City; Gregory J. Walch and Dana R. Walsh, Las Vegas,
for Amici Curiae Municipal Water Purveyors.

 

BEFORE THE COURT EN BANC.

*OPINION*[1]

By the Court, PICKERING, J.:

These consolidated appeals challenge the district court's orders denying judicial review of the State Water Engineer's decisions affecting water rights. Under NRS 533.370(2), the State Engineer "shall reject" an application for a proposed use of water or change of existing water rights where that "proposed use or change conflicts with existing rights." The parties ask this court to determine whether this section allows for the State Engineer to take into account the applicant's ability to mitigate the drying up of existing rights holders' water sources when determining if a proposed use or change will conflict with existing rights. However, even assuming that under NRS 533.370(2) the State Engineer has authority to grant an application that conflicts with existing rights based upon a determination that the applicant will be able to mitigate, the State Engineer's decision to approve the applications and issue the permits at issue here is not supported by sufficient evidence that successful mitigation efforts may be undertaken so as to dispel the threat to the existing rights holders. We thus reverse the district court's decision denying judicial review of the State Engineer's decisions and remand.

_____

[1]We originally reversed and remanded in an unpublished order. Respondents and other interested persons not party to these appeals moved to publish the order as an opinion. We grant the motions and publish this opinion in place of our earlier order. *See* NRAP 36(f).

At the heart of this appeal is the Mount Hope Mine, a large proposed molybdenum mine that General Moly, Inc. seeks to establish in Eureka County. The mine's contemplated life is 44 years, and will require an estimated total of 11,300 acre feet of water per year (afa). To provide the water for the mine, General Moly seeks to pump groundwater by well from the Kobeh Valley and Diamond Valley groundwater basins, basins that already source many existing water rights, which will cause a drawdown of the water table throughout the two valleys. According to a water resources monitoring plan created by Eureka Moly, LLC, a subsidiary of General Moly, the vast majority of this water for the Mount Hope Mine "will be consumptively used in processing activities of the [mining] Project (*i.e.*[,] no water will be returned to the aquifer)."

General Moly created respondent Kobeh Valley Ranch, LLC (KVR) to hold and control the water rights for the project. Water rights already appropriated by a predecessor entity associated with the mining project were transferred to KVR, as were existing applications to appropriate water that the predecessor had filed in 2005. Between 2006 and 2010, KVR also filed numerous applications to change the point of diversion, the place of use, and the manner of use of other of its existing water rights. Appellant Eureka County protested KVR's applications on numerous grounds, including that KVR's groundwater appropriations would conflict with existing rights under NRS 533.370(2). A number of holders of senior water rights sourced in Kobeh Valley and Diamond Valley also protested on those, and other, grounds. The State Engineer originally held a hearing on the applications, then pending, in 2008, after which he approved some of KVR's applications over these objections, but

 

upon review the district court vacated the ruling and remanded the matter back to the State Engineer for a new hearing.

The State Engineer held another hearing in 2010, in which he accepted the evidence presented at the first hearing and allowed additional evidence to be presented regarding specific water usage at the proposed mining project. The State Engineer ultimately granted all of KVR's applications in his Ruling Number 6127.

Pertinent to this appeal, the State Engineer recognized that certain springs located on the Kobeh Valley floor that are in hydrologic connection with the underlying water table and that source existing, senior water rights would be "impacted" by KVR's pumping. However, the State Engineer found that KVR could fully mitigate any impact, and to that end required KVR to prepare, with the assistance of Eureka County, a monitoring, management, and mitigation plan (3M Plan) for approval by the State Engineer before KVR diverted any water. The State Engineer then issued KVR the various use and change permits requested.

Eureka County, as well as appellants Kenneth F. Benson, Diamond Cattle Company, LLC, and Michel and Margaret Ann Etcheverry Family, LP, (collectively referred to as Benson-Etcheverry), all of whom hold existing, senior rights in the valleys, petitioned the district court for judicial review of Ruling 6127. The district court denied the petition, finding that substantial evidence supported the State Engineer's decision that KVR would be able to mitigate any adverse impacts to existing water rights. The district court further held that NRS 533.370(2) "does not prevent the State Engineer from granting applications that may impact existing rights if the existing right can be protected through mitigation, thus avoiding a conflict with existing rights."

While Ruling 6127 was before the district court, KVR developed a 3M Plan in coordination with Eureka County. Though the State Engineer approved the 3M Plan, he retained ultimate authority over it, stating that the 3M Plan was approved with the "understanding that components of the Plan are subject to modification based on need, prior monitoring results, or changes in the approved water rights." Benson-Etcheverry petitioned the district court for judicial review of this decision, but the district court denied that petition as well.

Eureka County and Benson-Etcheverry appeal the district court's order denying judicial review of Ruling 6127. Benson-Etcheverry also appeal the district court's subsequent order denying judicial review of the State Engineer's approval of the 3M Plan.

## II.

### A.

The State Engineer, who is charged with administering water rights in this state, *Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1061, 944 P.2d 835, 843 (1997), is required to approve applications to appropriate new water rights or to change the place, manner, or use of existing water rights if the applicant meets certain statutory requirements. NRS 533.370(1). However:

> Except as otherwise provided in subsection 10 [which excepts applications for environmental or temporary permits], where there is no unappropriated water in the proposed source of supply, *or where its proposed use or change conflicts with existing rights* or with protectable interests in existing domestic wells as set forth in NRS 533.024, or threatens to prove detrimental to

> the public interest, the State Engineer *shall reject the application and refuse to issue the requested permit.*

NRS 533.370(2) (emphases added).

The State Engineer and KVR submit that the State Engineer may conditionally grant proposed use or change applications on the basis of future successful mitigation, thereby ensuring that the new or changed appropriation does not conflict with existing rights, in accordance with NRS 533.370(2). This court has never addressed whether the statute may be read in this manner, and we need not do so at this time. Even assuming that the State Engineer may grant a proposed use or change application on the basis of the appropriator's ability to successfully mitigate and bring the existing water rights back to their full beneficial use, substantial evidence does not support the State Engineer's decision that this is the case here. *Town of Eureka v. Office of State Eng'r of State of Nev., Div. of Water Res.*, 108 Nev. 163, 165, 826 P.2d 948, 949 (1992) ("With questions of fact, the reviewing court must limit itself to a determination of whether substantial evidence in the record supports the State Engineer's decision.").

## B.

The State Engineer in his Ruling 6127 recognized that there would be "extensive" drawdown of the water table in Kobeh Valley near KVR's main well field area due to KVR's groundwater pumping, which could "impact" existing "rights on springs and streams in hydrologic connection with the water table . . . includ[ing] valley floor springs." He also recognized that:

> Water rights that could potentially be impacted are those rights on the valley floor where there is predicted drawdown of the water table due to

mine pumping. The Applicant recognizes that certain water rights on springs in Kobeh Valley are likely to be impacted by the proposed pumping. These springs produce less than one gallon per minute and provide water for livestock purposes.

(footnotes omitted).[2] But the evidence to which the State Engineer cited demonstrates that more than just an "impact" to these low-flow springs would occur. For instance, the State Engineer cited to KVR's hydrogeology expert Terry Katzer's testimony at the 2010 hearing that KVR's pumping would dry up certain springs and stock watering wells:

Q: Okay. Will the pumping over time cause impacts to springs in direct stock watering wells in the floor of Kobeh Valley?

A: I believe it will. And I can't name the springs because I am not that familiar with them. Mud Springs, for instance, I know where that is. I've been there. It will probably dry that up with time. And other springs that are in close proximity to the well field.

Q: Stock watering wells?

A: Stock watering wells, yes, probably.

Flow modeling reports by KVR's hydrogeology and groundwater modeling expert, Dwight Smith, to which the State Engineer also cited, confirmed this assessment:

Springs located in lower altitudes in the Roberts Mountains . . . are more likely to be impacted due

---

[2]Eureka County challenges the "less than a gallon per minute" finding, but KVR's 2010 flow modeling report indicates that these springs produced less than a gallon per minute. And, while the inventory KVR prepared in 2011 shows an estimated less than five gallon flow for Mud Spring, this is not inconsistent with a less than one gallon flow finding.

> to closer proximity to the KVCWF[ Kobeh Valley Central Well Field], resulting in larger predicted drawdown at these locations. Discharge at Mud Spring (Site 721) and Lone Mountain Spring (Site 742), located near the southeast edge of the KVCWF near proposed well 226, are predicted to be impacted and will likely cease to flow based on predicted drawdowns of 40 to 50 feet. Both of these springs discharge less than approximately one gallon per minute.

Smith also testified that Mud Springs and another spring called Lone Mountain Springs would cease to flow fairly soon after KVR begins pumping.

The federal Bureau of Land Management (BLM) claims unadjudicated reserved rights sourced from Lone Mountain Springs. And respondent Etcheverry Family, LP, holds permitted existing rights in Mud Springs, rights consisting of 10.86 afa to use for stock watering purposes.

Therefore, contrary to the State Engineer's, KVR's, and amici's assertions, KVR's pumping would not merely impact existing water rights; the very evidence upon which the State Engineer relied demonstrates that KVR's appropriation would cause the complete depletion of the source of existing water rights. The Legislature did not define exactly what it meant by the phrase "conflicts with" as used in NRS 533.370(2), but if an appropriation that would completely deplete the source of existing water rights does not "conflict with" those existing rights, then it is unclear what appropriation ever could. Furthermore, dictionary definitions from around the time a statute is enacted can aid this court in deciphering that statute's meaning, *Douglas v. State*, 130 Nev., Adv. Op. 31, 327 P.3d 492, 494 (2014), and contemporaneous reference material with the Legislature's adoption of the "conflicts with" aspect of NRS 533.370(2), defines "conflict," in verb form, as "[t]o be in opposition; be contrary or at

Supreme Court
OF
Nevada

(O) 1947A

variance." *See* 2 *The Century Dictionary and Cyclopedia, with a New Atlas of the World,* at 1186 (rev. enl. ed. 1911); 1913 Nev. Stat., ch. 140, § 63. To the extent that KVR's proposed appropriations would deplete the water available to satisfy existing rights at issue, they are undeniably "in opposition" thereto, and thus "conflict with" the existing rights under NRS 533.370(2).[3]

## C.

Considered separate and apart from any potential mitigation techniques, the appropriations in question are in conflict with existing water rights in the valleys. But the State Engineer found KVR could implement mitigation techniques that would ameliorate the depletion of Mud Springs: "The State Engineer finds that this flow loss can be adequately and fully mitigated by the Applicant should predicted impacts occur." Furthermore, because "the only way to fully ensure that existing water rights are protected is by closely monitoring hydrologic conditions while groundwater pumping occurs," the State Engineer found that "a monitoring, management and mitigation plan prepared with input from Eureka County must be approved by the State Engineer prior to pumping groundwater for the project." The State Engineer thus concluded that: "Based upon substantial evidence and testimony, and the monitoring, management and mitigation plan requirement, the State Engineer

[3]The State Engineer's ruling states that though the BLM originally protested KVR's appropriations, it withdrew its protests "after reaching a stipulation on monitoring, management and mitigation" with KVR. It seems the State Engineer assumed this was sufficient to dispense with the conflict under NRS 533.370(2), but this is a less than clear conclusion. In any event, Etcheverry Family, LP, has not withdrawn its protest of KVR's applications.

concludes that the approval of the applications will not conflict with existing water rights . . . ."

Nowhere in the ruling, however, does the State Engineer articulate what mitigation will encompass, even in the most general sense. And evidence of what that mitigation would entail and whether it would indeed fully restore the senior water rights at issue is lacking: there was no mitigation plan in the record before the district court or in existence when KVR's applications were granted. Indeed, KVR's representative Patrick Rogers acknowledged that he didn't "know what we [General Moly] would propose in a mitigation plan. A mitigation plan hasn't been developed yet. It would be speculative to say what we would or would not propose."

The State Engineer and KVR point to KVR's experts' testimony as evidence that mitigation could occur and would be successful. But Katzer, an hydrology expert, testified only that there were "a variety of [mitigation] techniques. You could increase the well if it's being fed by a well or you could run a pipeline to it from part of the distribution system." KVR's other expert, Smith, similarly testified that if predicted water table drawdown were to occur due to KVR's pumping, "certainly there can be mitigation measures taken, many of which could include shifting[ ] pumping around the well field as an easy example." While KVR's experts testified as to the existence of a few possible mitigation techniques, they did not specify what techniques would work, much less techniques that could be implemented to mitigate the conflict with the existing rights in this particular case. And concerns over precisely how KVR, or its parent company Eureka Moly, would mitigate these conflicts are not without cause: Martin Etcheverry testified that after KVR did some experimental

pumping, one of his springs, Nichols Springs, was noticeably lower than before the pumping and that it had not yet returned to its pre-pumping levels. And according to Eureka County's natural resource manager, the Nichols Springs lowering was brought to Eureka Moly's attention multiple times, including at a meeting at the BLM's Battle Mountain office, but that neither KVR nor Eureka Moly had done anything to address the lowering of that spring.

The State Engineer and KVR alternatively assert the existing rights holders conceded that mitigation could be accomplished. But the existing rights holders, including Martin Etcheverry, merely recognized in their 2010 hearing testimony that they would be satisfied if KVR could completely and successfully mitigate the interference with their rights.

The State Engineer implies on appeal that KVR's mitigation could encompass providing substitute water to the senior rights holders by arguing that said holders are entitled only to the beneficial use of the amount of their water rights, and have no right to the historical source of their water rights. *See Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997) ("[E]ven those holding certificated, vested, or perfected water rights do not own or acquire title to water. They merely enjoy the right to beneficial use."). But to the extent KVR's mitigation would involve substitute water sources—which is not reflected in the State Engineer's decision or the evidence that was presented to him—there was no evidence before the State Engineer that KVR applied for or committed certain of its already obtained water rights to mitigation or where the substituted water would otherwise come from. And, using the State Engineer's numbers regarding the amount of water in the basin, there may not be any water left to use for mitigation after KVR's appropriation.

The State Engineer found Kobeh Valley had 15,000 afa total. KVR's appropriation is 11,300 afa, and the other committed rights had 1,100 afa, which left 2,600 afa for future appropriation. However, there is 5,530 afa in nonadjudicated claims to vested or reserved rights on file in the State Engineer's office.

This is setting aside the further, specious assumption that water from a different source would be a sufficient replacement. Take, for example, the testimony given by an existing rights holder before the State Engineer that he had seen problems before with piping in water for animals because the pipes can freeze and interfere with the flow in the extreme winter cold. Given these, seemingly supported, concerns over such potential problems, it is therefore unclear that substitution water, if available, would be sufficient. *See, e.g., Weibert v. Rothe Bros., Inc.*, 618 P.2d 1367, 1373 (Colo. 1980) ("In order to determine the adequacy of the [augmentation] plan to accomplish its intended purpose, it is necessary to consider the adequacy of the replacement water rights."); *see also Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 135 P.2d 108, 114 (Utah 1943) (examining whether the exchange of water deteriorates water quality or quantity to such a degree as to "materially impair[ ] the use").

Added to this, a surface water rights holder may be found to have abandoned its right if it no longer delivers the water or maintains the source of diversion. NRS 533.060(4)(a)-(d). Requiring that existing rights holders use water other than from the source that they currently have rights in might mean the existing rights holder would need to obtain a new permit to appropriate that new water. *See* NRS 533.060(5) ("Any such right to appropriate any of the water must be initiated by applying to the State Engineer for a permit to appropriate the water as provided in

this chapter."). KVR did not address before the State Engineer this potential obstacle to providing water from an alternate source to mitigate, and neither did the State Engineer's ruling.

Finally, KVR asserts that the State Engineer's determination that "it is readily feasible to avoid conflicts when mitigating impacts to water sources that produce relatively minor amounts of water" merely reflects the State Engineer's "experience and common sense." But this is precisely the problem with the State Engineer's ruling: though the State Engineer certainly may use his experience to inform his decision making, his decisions must be supported by substantial evidence in the record before him, which is not the case here. *Town of Eureka*, 108 Nev. at 165, 826 P.2d at 949.

### D.

Essentially, and with all other arguments aside, the State Engineer and KVR's position is that the State Engineer may leave for a later day, namely the day the 3M Plan is put before him, the determination of exactly what KVR's mitigation would entail. But the State Engineer's decision to grant an application, which requires a determination that the proposed use or change would not conflict with existing rights, NRS 533.370(2), must be made upon presently known substantial evidence, rather than information to be determined in the future, for important reasons.

First, those who protest an application to appropriate or change existing water rights must have a full opportunity to be heard, a right that includes the ability to challenge the evidence upon which the State Engineer's decision may be based. *Revert v. Ray*, 95 Nev. 782, 787, 603 P.2d 262, 264 (1979); *see also* NRS 533.365(5) ("Each applicant and each protestant shall . . . provide to the State Engineer and to each

protestant and each applicant information required by the State Engineer relating to the application or protest."). *Cf. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974) ("[T]he Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation."). This necessarily means that the opportunity to challenge the evidence must be given *before* the State Engineer grants proposed use or change applications. Those who protest an application's grant cannot be forced to wait and challenge a future 3M Plan because, as Benson-Etcheverry note: "The appeal as to Ruling No. 6127 can result in vacating the Ruling, among other remedies. However, appeal of the 3M Plan can only result in vacating the Plan." In other words, challenging the sufficiency of a later developed mitigation plan cannot undo a decision to grant applications for a proposed use or change that may have been erroneous. And allowing the State Engineer to grant applications conditioned upon development of a future 3M Plan when the resulting appropriations would otherwise conflict with existing rights, could potentially violate protestants' rights to a full and fair hearing on the matter, a rule rooted in due process. *Revert*, 95 Nev. at 787, 603 P.2d at 264.

Furthermore, the State Engineer's decision to grant an application must be sufficiently explained and supported to allow for judicial review. *Id.*, 603 P.2d at 265; *see also Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*, 788 F.2d 705, 708 (11th Cir. 1986) (even under deferential substantial evidence review, courts must not merely "rubber stamp" agency action: they must determine that the "agency articulated a rational connection between the facts presented" and the decision) (internal quotation omitted). The State Engineer thus may

not defer the determination of what mitigation would encompass to a later date: even if he may grant applications where the resulting appropriations would conflict with existing rights based upon the finding that the applicant would be able to successfully mitigate that deleterious effect, an assumption we do not adopt today, the finding must be based upon evidence in the record to support that mitigation would be successful and adequate to fully protect those existing rights. *See City of Reno v. Citizens for Cold Springs*, 126 Nev. 263, 276, 236 P.3d 10, 18-19 (2010) (law requiring local governments to make a finding about plans for adequate services and infrastructure prior to amending a master plan to allow further development "require[d] something more than the deferral of the issue or broad, evasive conclusions about how officials can build or expand utilities if necessary").

### III.

In sum, substantial evidence does not support the State Engineer's finding that KVR would be able to "adequately and fully" mitigate the fact that its groundwater appropriations will cause Kobeh Valley springs that sources existing rights to cease to flow. The State Engineer's decision to grant KVR's applications, when the result of the appropriations would conflict with existing rights, and based upon unsupported findings that mitigation would be sufficient to rectify the conflict, violates the Legislature's directive that the State Engineer must deny use or change applications when the use or change would conflict with existing rights. NRS 533.370(2). As appellants have met their burden to show the State Engineer's decision was incorrect, NRS 533.450(10), the State Engineer's decision to grant KVR's applications cannot stand.

We therefore reverse and remand these matters to the district court for proceedings consistent with this opinion.[4]  Because we reverse and remand on this basis, we do not reach the remaining issues raised in these consolidated appeals.

_____, J.
Pickering

We concur:

_____, C.J.
Hardesty

_____, J.
Douglas

_____, J.
Saitta

_____, J.
Parraguirre

_____, J.
Cherry

_____, J.
Gibbons

---

[4]From the record and Ruling 6127, it is unclear which of KVR's applications for proposed use or change in Kobeh Valley, if it can be pinpointed, is the appropriation that will cause the springs to dry up. Therefore, we must overturn the entire decision.