OPINION
By the Court,
Hardesty, J.:
In this appeal, we consider whether an agent may properly apply for water rights permits on behalf of the actual appropriator. While we conclude that an agent may request permits based on the ultimate user’s need for water, we also adopt the anti-speculation doctrine, which requires the agent to have a contractual or agency relationship with the water’s appropriator. Even though the agent in this case properly applied for a water rights permit on behalf of the appropriator, we conclude that the State Engineer failed to properly consider the evidence in determining the need for water in the import basin. Accordingly, we reverse the district court order denying judicial review.

FACTUAL AND PROCEDURAL HISTORY

Primm South Real Estate Company owns approximately 825 acres of land along Interstate 15: 800 acres of Primm South’s land are located in Primm, Nevada, and an adjacent 25 acres are located in California. In 1999, the city of Primm had three casinos *1113 (including the MGM Grand), an outlet mall, a power plant (Reliant Energy), and a welcome center. These facilities’ water needs were serviced by Primadonna Corporation, the entity under which Primm South held water rights.
Because Primm South intended to expand its operations in Primm, in the summer of 1999 it sought, through its agent Vidler Water Company, an interbasin groundwater transfer[1] from the Sandy Valley Basin in Mesquite Valley, Nevada, to the Ivanpah Basin in Primm, Nevada. In support of its application, Vidler Water maintained that the water appropriations in the Ivanpah Basin exceeded its perennial yield, that is, the amount of water being taken out of the Ivanpah Basin each year exceeded what was naturally returned.
When the State Engineer considered Vidler Water’s application approximately two years later in 2001, Primadonna held permits to appropriate water from the Ivanpah Basin for consumptive use at a rate of 751 acre-feet annually (afa).[2] For the calendar year 2001, Primadonna reported a total consumptive use for all facilities as 463.96 afa, or about 62 percent of the total consumptive use allowed under the terms of their water right permits. Nevertheless, Vidler Water ultimately requested that 1,400 afa be transferred from a certain Sandy Valley point of diversion, for use by Primm South. The appellants, who are residents of Sandy Valley, opposed Vidler Water’s application.

Primm South’s future water needs

During the application hearing, Primm South’s vice-president, Doug Clemetson, testified on behalf of Vidler Water. Clemetson’s testimony highlighted his company’s current water use, his company’s planned future developments in the city of Primm, and how those future developments would affect Primm South’s need for additional water. Future projects included expansions of the power plant and the existing mall, apartment-style employee housing, an industrial warehouse park, a theme park, and a train station, some of which are already included in the master plan.[3]
At the time of the hearing, the power plant expansion was in its first phase of construction. Clemetson testified that the power plant currently had enough water for the 550-megawatt phase first to be completed and for intended operations after completion. *1114 Clemetson then gave three reasons why the power plant would need more water: (1) there are plans to expand it, “as needed,” up to 1,000 megawatts; (2) the plant’s “comfort level” would rise if it could obtain fresh water, instead of merely effluent water; and (3) if a drought were to occur, the power plant could shut down because its right to water is contractually subordinate to the MGM Grand’s and the mail’s rights.
Clemetson also testified that his company was “moving forward” on the existing mall’s expansion to nearly double its current size. Clemetson explained that an engineering firm had advised his company, however, that the mail’s expansion was not possible until the company secured more water rights.
Clemetson also pointed to a third project: apartment-style housing for employees of the MGM Grand and the mall. This project would be completed in two phases. The first phase comprises 800 units, and the second phase, which was not built at the time of the hearing, includes 300 units. Clemetson indicated that the first phase would be completed with existing water rights, but the second phase would require additional water.
The industrial warehouse park, the fourth project, would consist of warehouse distribution and light industrial manufacturing centers. Clemetson testified that his company “was talking to” several builders about the project. When asked if Clemetson’s company was “moving forward” on the project, Clemetson replied “we’re interested in the development [of the] industrial park.”
The fifth project for which Clemetson noted a need for additional water is a theme park. This project, however, is contingent upon two factors. First, Clemetson testified that a theme park is not feasible until more people are attracted by gaming to exit the freeway. Second, the theme park plan is contingent upon Primm South deciding to forgo construction on the industrial warehouse park. Accordingly, water would not be needed for both the fourth and fifth projects but could be required for one of those projects.
The final project is the train station. Clemetson testified that developers had “talked” about providing rail services from Las Vegas to Primm. Based upon this observation, Clemetson stated that “we would contribute to that effort by putting a station out there in which if it were to go forward,’ ’ there would be a number of people stopping in Primm.

The State Engineer grants Vidler Water’s application in part

When reviewing an application for an interbasin groundwater transfer, the State Engineer must analyze factors outlined in NRS *1115 533.370(6), including the applicant’s need to import water.[4] The State Engineer found that Vidler Water had satisfied the need requirement, noting Primm South’s proposed uses and relaying the following:
Primadonna Corporation holds permits to appropriate groundwater that allow for a total of 751 afa of consumptive use, though with recharge credits are allowed to pump a maximum of 1,734 afa. Mr. Clemetson testified that it was his understanding that approximately 300 acre-feet of the 751 afa remains uncommitted. Based on the pumpage data submitted to the State Engineer for the years 1999, 2000 and 2001, an average of 834 afa has been pumped, under the Primadonna Corporation’s permits. For the calendar year 2001, the Primadonna Corporation reported the consumptive uses for all facilities, including the construction of the Reliant Energy [power plant], at 463.96 afa, which represents approximately 62% of the total consumptive use under the terms of the permits.
. . . Water appropriations in Ivanpah Valley — Northern have exceeded the perennial yield, making it necessary for the State Engineer to curtail the issuance of any new appropriations not in the public’s interest. The State Engineer finds that evidence and testimony presented justified the need to import water to Ivanpah Valley for existing and proposed uses.
Thus, the State Engineer concluded that Vidler Water, through Clemetson’s testimony, had satisfied NRS 533.370(6)(a) by justifying the current and future needs to import the water. The State Engineer also concluded that importing up to 415 afa of water from the Sandy Valley Basin would not detrimentally impact that basin.
Because the State Engineer found that the NRS 533.370(6) factors did not support rejecting Vidler Water’s application, he approved it for 2.0 cubic feet per second, not to exceed the amount available in the Sandy Valley Basin, 415 afa. Sandy Valley residents filed a petition for judicial review of the State Engineer’s decision with the district court. The district court denied the petition, and the Sandy Valley residents appeal, challenging Vidler Water’s right, as a non-appropriator, to apply for water rights on Primm South’s behalf, and the State Engineer’s findings as to the impact *1116 of withdrawing water from Sandy Valley and Primm South’s need for additional water rights.

DISCUSSION

Water in Nevada belongs to the public[5] and is a precious and increasingly scarce resource. Consequently, state regulation like that in NRS Chapters 533 and 534 is necessary to strike a sensible balance between the current and future needs of Nevada citizens and the stability of Nevada’s environment.
NRS Chapter 533 prescribes the general requirements that every applicant must meet to appropriate water. Its fundamental requirement, as articulated in NRS 533.030(1), is that water only be appropriated for “beneficial use.”[6] In Nevada, beneficial use is “the basis, the measure and the limit of the right to the use of water.’ ’[7]
The right to use water for a beneficial use depends on a party actually using the water.[8] Under NRS 533.070(1), once beneficial use is established, “[t]he quantity of water . . . appropriated . . . shall be limited to such water as shall reasonably be required for the beneficial use to be served.” Once the party’s “necessity for the use of water” ceases to exist, “the right to divert [the water] ceases” as well.[9]
As water appropriations, interbasin groundwater transfers, like the one at issue in this appeal, are subject to the beneficial use requirement.[10] Reflecting the beneficial use policy, NRS 533.370(6)(a) directs the State Engineer to consider the need to import water from another basin when reviewing interbasin *1117 groundwater transfer applications.[11] The interpretation of NRS 533.370(6)(a) — whether a third-party’s beneficial use can justify the “need to import the water” — is an issue of first impression for Nevada.

An applicant can satisfy the “need to import the water” requirement of NRS 533.370(6)(a) by providing evidence of third-party need

Appellants argue that, as a matter of law, NRS 533.370(6)(a) can only be satisfied by an applicant presenting evidence of personal need for water. We disagree.
The district court may decide purely legal questions without deference to an agency’s determination.[12] “Accordingly, the reviewing court may undertake independent review of the construction of a statute.”[13]
If a statute is clear on its face, the court cannot go beyond its plain language in determining legislative intent.[14] But if a statute is ambiguous, it should be construed “in line with what reason and public policy would indicate the legislature intended.”[15] “ ‘A statute or portion thereof is ambiguous when it is capable of being un *1118 derstood by reasonably well-informed persons in either of two or more senses.’”[16] While the State Engineer’s interpretation of a statute is not controlling, it is persuasive.[17]
As noted above, NRS 533.370(6) delineates the statutory requirements that the State Engineer must consider when deciding whether to approve or reject an application for an interbasin groundwater transfer. At issue here is NRS 533.370(6)(a): ‘ ‘Whether the applicant has justified the need to import the water from another basin.”
Because it does not specify whose need must be justified, the language of NRS 533.370(6)(a) is ambiguous as to whether the need to import water must be proven by showing the applicant’s need, or whether a third-party’s need will suffice, since reasonably well-informed persons could reach either conclusion. Thus, we construe the statute consistently with what reason and public policy indicates the Legislature intended. We conclude that both reason and public policy demonstrate the Legislature’s intent that third-party need may satisfy the “need” requirement of NRS 533.370(6)(a).
Almost 100 years ago, in Prosole v. Steamboat Canal Co., this court determined that it is reasonablejo allow the water user’s agent to file an application for water diversion.[18] The court concluded ‘ ‘that he who applies the water to the soil, for a beneficial purpose, is in fact the actual appropriator, although the application may be made through the agency of another.”[19] While Prosole does not interpret the “need” requirement of NRS 533.370(6)(a), it demonstrates that several decades before NRS 533.370(6) was enacted, it was considered reasonable for an applicant to satisfy certain water permit requirements through a showing of the actual appropriator’s beneficial use.
Moreover, other jurisdictions recognize the reasonableness of allowing a third party to satisfy certain water permit requirements. The Wyoming Supreme Court has concluded that, “no matter who may initiate the right, if it is perfected the general purpose of an appropriation is accomplished.”[20] And the New Mexico Supreme Court used similar reasoning when it concluded that “[pjersons who divert or withdraw waters from a stream or basin[ ] need not be the ones who ultimately make the beneficial *1119 use thereof, or for whose benefit the use is made.”[21] Like Nevada’s statutory scheme, no New Mexico law required that applications to appropriate water for a beneficial use had to be made by the persons who would ultimately use the water.[22] Accordingly, it is reasonable to assume that the Legislature intended to allow water rights permit applicants to rely on a third-party’s need to establish beneficial use.
Finally, public policy supports our conclusion that the Legislature intended that a third party can satisfy certain water permit requirements. Although this court and the Legislature have repeatedly recognized that beneficial use is the central concept in Nevada water law, the Legislature has never, even in drought years, passed legislation requiring the applicant to be the party putting the water to beneficial use. Thus, we will not reach the unreasonable result of requiring that the applicant also be the beneficial user.[23]
Accordingly, as both reason and public policy suggest that, under NRS 533.370(6)(a), the applicant need not be the party putting water to beneficial use, the State Engineer did not err by allowing Vidler Water to satisfy the need requirement of NRS 533.370(6)(a).

The anti-speculation doctrine

However, an applicant’s ability to satisfy NRS 533.370(6)(a)’s requirement by demonstrating third-party need is limited by the “anti-speculation doctrine.” In Three Bells Ranch v. Cache La Poudre, the Colorado Supreme Court discussed the “anti-speculation doctrine,” explaining that, in part, the doctrine “addresses the situation in which the purported appropriator does not intend to put water to use for its own benefit and has no contractual or agency relationship with one who does.”[24] This doctrine precludes speculative water right acquisitions without a showing of beneficial use. Precluding applications by persons who would only speculate on need ensures satisfaction of the beneficial use requirement that is so fundamental to our State’s water law jurisprudence. Thus, we agree with this limitation on an applicant’s showing of third-party need and adopt the anti-speculation doctrine’s formal relationship requirement for Nevada. Further, we *1120 note that our adoption of this doctrine comports with the language and goals of NRS 533.370(l)(c)(2), which, to protect against speculation, requires the applicant to show both financial ability and a reasonable expectation with respect not only to constructing any work needed to apply the water, but also to “apply the water to the intended beneficial use with reasonable diligence.”[25] Consequently, an applicant seeking an interbasin groundwater transfer under NRS 533.370 must have an agency or contractual relationship with the party intending to put the water to beneficial use. And, the approved transfer must specify the intended beneficial use of the appropriation.[26]
In this case, Primm South authorized Vidler Water to act as its agent in acquiring water resources for the development of the power plant, housing for the MGM Grand and mall employees, a possible theme park if the industrial park was not developed, and the expansion of the outlet mall.[27] Because Primm South authorized Vidler Water to act as its agent in acquiring water resources for the development of these projects, Vidler Water’s interbasin groundwater transfer application did not violate the anti-speculation doctrine.[28]

The State Engineer did not abuse his discretion when he determined that the appellants would not be detrimentally impacted by the withdrawal of water from the Sandy Valley Basin

Appellants argue that the State Engineer acted arbitrarily and violated NRS 533.370(6)(d), which requires consideration of the export basin’s long-term needs, when he found that the Sandy Valley Basin would not be detrimentally impacted by Vidler Water’s withdrawal of water.
NRS 533.450(8) states that a party aggrieved by a district court order regarding the decision of the State Engineer may have the order reviewed on appeal. However, this court’s review of a State *1121 Engineer’s decision is limited.[29] This court, like the district court, may not substitute its judgment for the State Engineer’s judgment.[30] Additionally, this court will not examine witness credibility or reweigh the evidence; instead, this court’s review focuses on whether the record includes substantial evidence to support the State Engineer’s decision.[31] This court has defined substantial evidence as that which “‘a reasonable mind might accept as adequate to support a conclusion.’ ’ ’[32]
The State Engineer concluded that an extensive hydrologic and groundwater report compiled by an experienced geologist was inconclusive because it assumed that the aquifer was homogeneous, but that actually, the aquifer was more complicated. Nevertheless, after considering well testing in the Sandy Valley Basin and “the large agricultural uses on the California side of the basin,” the State Engineer still found that the approved 415 afa withdrawal would have a negligible impact on the existing wells in the Sandy Valley Basin and thus no detrimental impact on the appellants’ existing water rights. A reasonable mind could accept the State Engineer’s analysis of the evidence as adequate to support that conclusion. Therefore, the State Engineer’s decision that NRS 533.370(6)(d) was satisfied is supported by substantial evidence.[33]

The State Engineer abused his discretion in finding that Vidler Water had presented evidence justifying a need to import water under NRS 533.370(6) (a)

The appellants also argue that Vidler Water failed to present substantial evidence of Primm South’s need to import water from the Sandy Valley Basin to the Ivanpah Basin. Thus, the appellants argue that the need requirement under NRS 533.370(6)(a) was not satisfied. We agree.

The State Engineer’s findings

The State Engineer concluded that the “evidence and testimony presented [by Vidler Water] justified the need to import water to Ivanpah Valley for existing and proposed uses.” In reaching this conclusion, the State Engineer made two specific findings. First, *1122 the State Engineer found that the import basin, Ivanpah Valley, had exceeded its perennial yield and thus evidence of a need to import water into the Ivanpah Valley Basin was presented.[34] Second, the State Engineer found that Vidler Water presented adequate evidence of Primm South’s future water needs.

Primm South’s need for water is not supported by substantial evidence

At the time of the hearing, Primadonna held water permits authorizing it to appropriate 751 afa.[35] The State Engineer found that Primadonna’s total consumptive use for 2001, which included the Reliant Energy power plant’s first phase expansion, equaled 463.96 afa.[36] This number represented approximately 62 percent of Primadonna’s total consumptive use permits. Thus, at the time of the hearing, Primadonna had approximately 287 afa available to apply to Primm South’s development projects.
When reaching his decision to grant Vidler Water’s application, the State Engineer considered the proposed power plant second phase expansion, the mall expansion, the MGM Grand employee housing, an industrial park, and a theme park. Both the State Engineer’s decision and the record suffer from a fundamental defect: neither specifies how much afa of water each project would require and how that quantity would be reduced by Primm South’s unused water permits.[37] Without this specificity, a reasonable mind *1123 could not accept as adequate the conclusion that Vidler Water had justified a need to import 415 afa of water from the Sandy Valley Basin. Because he failed to make the necessary calculations to determine Primm South’s future water usage by project and the support of that usage by the imported water, the State Engineer’s decision is not supported by substantial evidence. We therefore conclude the State Engineer abused his discretion in finding that Vidler Water had presented sufficient evidence to justify a need to import water under NRS 533.370(6)(a).

CONCLUSION

Because the State Engineer failed to make the appropriate findings, his decision to grant Vidler Water’s interbasin groundwater transfer application was not supported by substantial evidence, and we reverse the district court’s order denying appellants’ petition for judicial review.
Maupin and Gibbons, JJ., concur.

 See NRS 533.370(10) (“ ‘[Tjnterbasin transfer of groundwater’ means a transfer of groundwater for which the proposed point of diversion is in a different basin than the proposed place of beneficial use.”).

 See NRS 533.065(2) (“The unit of volume [for] an acre-foot [is] defined as 43,560 cubic feet.”).

 An approved master plan, which includes the casinos, the power plant, employee housing, and the industrial park, is registered with the county.

 NRS 533.370(6)(a). The Legislature amended NRS 533.370 in 2003 and 2005, ultimately changing NRS 533.370(4), the statute referenced at the time of the hearing, to NRS 533.370(6).

 NRS 533.025.

 See also NRS 533.045 (“[N]o person shall be permitted to divert or use . . . waterf ] . . . except at such times as the water is required for a beneficial purpose.”).

 NRS 533.035; see also Desert Irr., Ltd. v. State of Nevada, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997) (“The concept of beneficial use is singularly the most important public policy underlying the water laws of Nevada and many of the western states.”).

 Barnes v. Sabron, 10 Nev. 217, 243-45 (1875).

 NRS 533.045.

 NRS 534.020(1) (“All underground waters within the boundaries of the State ... are subject to appropriation for beneficial use only under the laws of this State relating to the appropriation and use of water and not otherwise.”).

 NRS 533.370(6) states,
In determining whether an application for an interbasin transfer of groundwater must be rejected pursuant to this section, the State Engineer shall consider:
(a) Whether the applicant has justified the need to import the water from another basin;
(b) If the State Engineer determines that a plan for conservation of water is advisable for the basin into which the water is to be imported, whether the applicant has demonstrated that such a plan has been adopted and is being effectively carried out;
(c) Whether the proposed action is environmentally sound as it relates to the basin from which the water is exported;
(d) Whether the proposed action is an appropriate long-term use which will not unduly limit the future growth and development in the basin from which the water is exported; and
(e) Any other factors the State Engineer determines to be relevant.

 Town of Eureka v. State Engineer, 108 Nev. 163, 165, 826 P.2d 948, 949 (1992).

 Id.

 White v. Warden, 96 Nev. 634, 636, 614 P.2d 536, 537 (1980).

 Cannon v. Taylor, 87 Nev. 285, 288, 486 P.2d 493, 495 (1971), superseded in part on reh’g, 88 Nev. 89, 493 P.2d 1313 (1972); see generally White, 96 Nev. 634, 614 P.2d 536.

 Robert E. v. Justice Court, 99 Nev. 443, 445, 664 P.2d 957, 959 (1983) (quoting Madison Met. Sewer. Dist. v. Department of Nat. Res., 216 N.W.2d 533, 535 (Wis. 1974)).

 State v. State Engineer, 104 Nev. 709, 713, 766 P.2d 263, 266 (1988).

 37 Nev. 154, 158-59, 140 P. 720, 722 (1914).

 Id. at 162, 140 P. at 723.

 Scherck v. Nichols, 95 P.2d 74, 79 (Wyo. 1939).

 Mathers v. Texaco, Inc., 421 P.2d 771, 778 (N.M. 1966).

 Id.

 Desert Valley Water Co. v. State Engineer, 104 Nev. 718, 720, 766 P.2d 886, 886 (1988) (“When interpreting a statute, we resolve any doubt as to legislative intent in favor of what is reasonable, as against what is unreasonable.”).

 758 P.2d 164, 173 n.11 (Colo. 1988).

 See, e.g., Hearing on S.B. 98 Before the Assembly Governmental Affairs Comm., 68th Leg. (Nev., April 11, 1995).

 NRS 533.370(l)(c)(l).

 In the first letter drafted to Vidler, Primm South authorized Vidler to act as its agent in acquiring new water sources for development in Primm, Nevada. The general scope of this authorization was subsequently reduced, in a second letter, to these five projects.

 As set forth above, testimony was taken concerning an additional project, the train station. A review of the record, however, shows that the State Engineer did not consider the train station when granting Vidler’s application. Therefore, the anti-speculation doctrine was not violated as it pertains to the train station.

 Revert v. Ray, 95 Nev. 782, 786, 603 P.2d 262, 264 (1979).

 Id.

 Id.

 State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

 Revert, 95 Nev. at 786, 603 P.2d at 264 (providing that “we will not pass upon the credibility of the witnesses nor reweigh the evidence, but limit ourselves to a determination of whether substantial evidence in the record supports the State Engineer’s decision”).

 The evidence relied upon consisted of findings made in a previous ruling: Ruling No. 4326 dated April 16, 1996. Borrowing from that ruling, the State Engineer found that “[w]ater appropriations in Ivanpah Valley-Northern have exceeded the perennial yield, making it necessary for the State Engineer to curtail the issuance of any new appropriations not in the public’s interest.” Because the appellants did not challenge this finding at the administrative level, it cannot be challenged on appeal. See Dubray v. Coeur Rochester Inc., 112 Nev. 332, 337 n.2, 913 P.2d 1289, 1292 n.2 (1996) (stating that the failure to raise an issue at the administrative level results in a waiver of the issue on appeal).

 With recharge credits, Primadonna held permits to pump up to 1,734 afa. The State Engineer acknowledged this number but did not utilize it when calculating how much water Primadonna had yet to use.

 Primadonna is affiliated with Primm South, and Clemetson is involved in each in an executive capacity. The State Engineer considered Primadonna’s available water permits during Vidler Water’s application process because the available water permits are controlled by Clemetson and will be used in developing Primm South’s projects.

 Some projects, including the theme park, had contingencies attached to them. In other words, the projects may be speculative in nature. Although we do not reach whether contingent projects may be considered in evaluating a need for water under NRS 533.370(6) because we conclude that the State Engineer abused his discretion on other grounds, we note that speculative evidence of development projects is not sufficient to survive a substantial evidence inquiry on review.