MINERAL COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA; AND THE WALKER LAKE WORKING GROUP, PETITIONERS, v. STATE OF NEVADA, DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES, AN AGENCY OF THE STATE OF NEVADA; PETER MORROS, DIRECTOR OF THE DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES; R. MICHAEL TURNIPSEED, STATE ENGINEER; WALKER RIVER IRRIGATION DISTRICT, A NEVADA IRRIGATION DISTRICT; LYON COUNTY AND THE CITY OF YERINGTON, POLITICAL SUBDIVISIONS OF THE STATE OF NEVADA, RESPONDENTS.

No. 36352

April 11, 2001

20 P.3d 800

*Campbell & Stone,* Reno; *Western Environmental Law Center* and *Marc David Fink* and *Michael Dana Axline,* Eugene, Oregon, for Petitioners.

*Frankie Sue Del Papa,* Attorney General, and *Paul G. Taggart* and *William J. Frey,* Deputies Attorney General, Carson City, for Respondents State of Nevada, Department of Conservation and Natural Resources; Peter Morros, Director of Department of Conservation and Natural Resources; and R. Michael Turnipseed, State Engineer.

*George N. Benesch,* Reno, for Respondent Lyon County.

*Brooke Shaw Plimpton Zumpft,* Minden, for Respondent City of Yerington.

*Woodburn & Wedge* and *Gordon H. DePaoli,* Reno, for Respondent Walker River Irrigation District.

*Mackedon & McCormick,* Fallon, for Amicus Curiae City of Fallon.

*Allison MacKenzie Hartman Soumbeniotis & Russell* and *Karen A. Peterson* and *Christopher F. MacKenzie,* Carson City, for Amicus Curiae Humboldt River Basin Water Authority.

*Stanley H. Brown, Jr.,* Reno; *Herum Crabtree Brown* and *Jeanne Zolezzi, Jennifer L. Spaletta* and *James Belford Brown,* Stockton, California, for Amicus Curiae Town of Walker Lake.

# OPINION

By the Court, YOUNG, J.:

This is an original proceeding brought by Mineral County and the Walker Lake Working Group (collectively "Petitioners") against the State of Nevada, the Nevada Department of Conservation and Natural Resources and its Director, and the State Engineer (collectively "Respondents"). During the pendency of the briefing schedule in this case, Walker River Irrigation District ("WRID"), Lyon County, and the City of Yerington successfully moved to intervene. The petition seeks a writ of prohibition to prevent Respondents from granting additional rights to withdraw surface water or groundwater from the Walker River system and a writ of mandamus challenging Respondents' public trust obligations in managing and appropriating water flows into Walker Lake.

Petitioners seek the issuance of the writs to prevent Respondents from taking future actions that threaten to decrease future water flows into Walker Lake. They also seek a review of current and past water allocation decisions by the State Engineer that affect water appropriation in the Walker River Basin.

We conclude that issuance of the writs would not be proper because substantially similar litigation is pending in a more appropriate forum. Accordingly, we deny the petitions.

## The Walker River Basin

The Walker River Basin covers an area that consists of approximately 4,050 square miles. The entire basin stretches in a northeasterly direction from its origins in the southwestern elevations of the Sierra Nevada Mountains to the basin's terminus, Walker Lake. Between the headwaters of the Walker River in Mono County, California, and its terminus at Walker Lake in Mineral County, Nevada, the Walker River Basin includes portions of

Nevada's Douglas, Lyon, and Churchill Counties. Approximately twenty-five percent of the Walker River Basin lies within California, and this portion of the basin accounts for the majority of the precipitation. This section of the basin is also the primary source of the basin's surface water flows. On the other hand, the vast majority of consumptive water use within the basin, including evapotranspiration and evaporation from surface waters, takes place in Nevada. The basin's principal agricultural water use occurs in Bridgeport and Antelope Valleys in Mono County, California, and Smith and Mason Valleys in Lyon County, Nevada.

The Walker River system consists of two forks, the West Walker River and the East Walker River. The West Walker River has its origins below the divide that separates the Walker River Basin from Yosemite National Park. From its origin, the West Walker River flows north through Leavitt Meadow and into Antelope Valley. Before reaching Nevada, water from the West Walker River is partially diverted into Topaz Reservoir for water storage.[1]

The second fork, the East Walker River, is fed by waters in the high Sierras north of Mono Lake. Water draining from Virginia Lakes flows north and joins with water from Green, Robinson, Summers, and Buckeye Creeks. These flows contribute to Bridgeport Reservoir.[2]

The confluence of these two forks is located approximately seven miles upstream from the city of Yerington, Nevada, at the south end of Mason Valley. The merged forks of the West and East Walker Rivers flow northerly and then turn south as they enter the Walker River Paiute Indian Reservation ("Reservation"). Here, the Walker River flows through Campbell Valley and enters Weber Reservoir. From Weber Reservoir, the Walker River continues south for approximately twenty-one miles before entering Walker Lake.[3]

Walker Lake is a remnant of the Pleistocene Lake Lahontan that covered much of northern Nevada. As the climate dried, Lake Lahontan receded and many closed valleys became isolated dry lakebeds. However, several major rivers draining from the eastern

---

[1]Topaz Reservoir, which straddles the California/Nevada border, was constructed in 1922 by WRID. WRID, which was organized by irrigation users in Smith and Mason Valleys in 1919, provides surface and storage water rights for approximately 80,000 acres of agricultural land located primarily in Smith and Mason Valleys in Lyon County, Nevada.

[2]Bridgeport Reservoir was constructed in 1923 by WRID for the purpose of providing water storage for downstream irrigators.

[3]Weber Reservoir was constructed on the Reservation by the United States for the benefit of the Walker River Paiute Indian Tribe ("Tribe"). This is the only reservoir on the main stem of the Walker River.

slopes of the Sierras continued to support lakes and wetlands in some of these closed valleys, including present day Walker Lake.[4]

Walker Lake is a "terminal lake," meaning there is no outflow from the lake and all surface runoff terminates in the lake. Walker Lake is approximately thirteen miles long, just over five miles wide, approximately ninety feet deep, and contains approximately two million acre-feet of water. The shores of Walker Lake are almost entirely devoid of major riparian plant growth due in part to the extreme fluctuations in highly variable lake levels.

The waters of Walker Lake are characterized by high concentrations of total dissolved solids ("TDS"), consisting mainly of salts; high temperatures; low dissolved oxygen; and the presence of hydrogen sulfide. The lake also tends to support large blooms of planktonic blue-green algae which, when combined with the high TDS concentrations and low dissolved oxygen, create an inhospitable environment for fish species in the lake.

The causes of Walker Lake's present water deficit are disputed by the parties. Due to the highly variable hydrology of the Walker River Basin, Walker River has rarely produced "average" inflows to Walker Lake. The confusion over the data is understandable, given the various reports and data relied upon by the parties. What is confirmed is that Walker Lake currently has less water than it had when initial recordings were taken in 1882. As of March 1996, Walker Lake had only fifty percent of its 1882 surface area and twenty-eight percent of its 1882 volume. The ultimate cause of the decline is potentially attributable to a number of factors, including, but not limited to, overconsumption, declining precipitation levels, and natural lake recession over time.

In November 1994, Public Resource Associates, a public interest organization concerned with the protection of Walker Lake's fragile environment, prepared a report on Walker Lake describing the then current status of the lake and its various wildlife. The report indicated that Walker Lake supports a fragile balance of algae, zooplankton, small crustaceans, insects, and three endemic fish species: the tui chub, Lahontan cutthroat trout, and Tahoe sucker. Walker Lake is also an important habitat for a wide variety of migratory birds, including American white pelicans, common loons, snowy plovers, long-billed curlews, double crested cormorants, white-faced ibis, gulls, herons, terns, grebes, avocets, and many others.

*Legal history and current proceedings*

Walker River and its tributaries in the Walker River Basin have been the object of litigation for nearly one hundred years. In

[4]*See* D. K. Grayson, *The Desert's Past: A Natural Prehistory of the Great Basin* (Smithsonian Institution Press, 1993).

1902, Miller & Lux, a cattle and land company, brought an action in the United States District Court for the District of Nevada against Thomas Rickey and others to enjoin interference with Miller & Lux's use of the Walker River. In October 1904, Rickey Land & Cattle Co. began two actions in a California state court against Miller & Lux to establish its prior right to waters on the East and West Walker Rivers.[5] In 1906, Miller & Lux and other defendants sought to enjoin the proceedings in the California actions on the grounds that the United States District Court for the District of Nevada had acquired prior jurisdiction. The United States Supreme Court agreed, and prosecutions of the California actions were enjoined.[6] The United States District Court entered a final decree in 1919.[7]

In 1924, the United States brought an action in the United States District Court for the District of Nevada seeking to establish a water right for the Reservation[8] and to settle all water rights on the Walker River system. The action was commenced to adjudicate the surface water rights of all users of the river basin, but did not concern groundwater rights. This litigation resulted in the entry of Walker River Decree C-125 ("Decree") in 1936.[9]

On appeal, the United States Court of Appeals for the Ninth Circuit accepted the report of the special master with respect to the quantity of water reserved to the Tribe. The Decree was subsequently amended to conform to the ruling of the court.[10]

The Decree formalized the ownership of surface water rights from the Walker River that had been acquired pursuant to Nevada's doctrine of prior appropriation; it did not address groundwater rights. The Decree created the Walker River Commission and the United States Board of Water Commissioners, which were appointed by the court to administer the Decree.

---

[5]See *Rickey Land & Cattle Co. v. Miller & Lux,* 218 U.S. 258 (1910); *Miller & Lux v. Rickey,* 146 F. 574 (D. Nev. 1906); *Miller & Lux v. Rickey,* 127 F. 573 (D. Nev. 1904).

[6]See *Rickey Land & Cattle,* 218 U.S. at 258.

[7]See *Pacific Livestock Company v. Thomas Rickey,* No. 731, Final Decree (D. Nev. 1919).

[8]The Reservation is home to the Tribe. The Tribe's name for itself is Agai Dicutta, which means "Trout Eater," or Numu, which means "the People." The Tribe has occupied the area north of and surrounding Walker Lake, which they called Agai Pah, which means "Trout Lake." *See* Alice E. Walker, Walker River Basin Panel, Nevada Water Law Conference, October 19-20, 2000.

[9]See *United States v. Walker River Irr. Dist.,* 11 F. Supp. 158, 159 (D. Nev. 1935).

[10]See *United States v. Walker River Irr. Dist.,* 104 F.2d 334, 339-40 (9th Cir. 1939).

*Decree's pending litigation in C-125*

In September 1987, the Tribe sought permission to intervene in the Decree Court's pending action to establish rules and regulations concerning applications to change the allocation of water rights subject to the Decree. The motion was granted on March 2, 1988; as a result, the Nevada State Engineer is now required to review change applications, subject to court approval.

In 1991, the California State Water Resources Control Board ("CSWRCB") issued restrictions placed on water licenses held by WRID requiring it to maintain minimum flows and pools in its reservoirs. As a result of the decision by CSWRCB, WRID filed a petition for declaratory and injunctive relief in the Decree Court. That petition was referred to as Sub-part C-125-A.

The Tribe served an answer, counterclaim, and cross-claim in response to WRID's Sub-part A petition. The United States then filed a motion for leave to file a counterclaim, which the Decree Court designated as Sub-part C-125-B. The counterclaims seek recognition of a right to store water in Weber Reservoir for use on lands of the Reservation and an implied federal reserved water right to use water on lands added to the Reservation in 1936. Sub-part B is still pending in the Decree Court.

On October 25, 1994, Mineral County filed a motion to intervene in the Decree litigation, which the Decree Court designated as Sub-part C-125-C. Mineral County's proposed intervention seeks reallocation of the waters of the Walker River. Mineral County claims that the actions of the CSWRCB "began the death of Walker Lake" and without reallocation Walker Lake will be irreparably degraded.

In its prayer for relief, Mineral County asks that the Decree Court reopen and modify the Decree, and that the court (1) recognize the rights of Mineral County to have minimum levels in Walker Lake, (2) order the State of Nevada to grant a certificate to Mineral County for the benefit of Walker Lake, and (3) recognize that minimum flows are necessary to maintain Walker Lake as a "beneficial use and in the public interest and required under the doctrine of maintenance of the public trust."

Mineral County's motion to intervene, which was filed approximately six years ago, is still pending before the Decree Court awaiting service upon the interested parties by Mineral County.

*Current procedural posture and parties*

Petitioners Mineral County and the Walker Lake Working Group filed this original writ proceeding on June 26, 2000. Mineral County is a political subdivision of the State of Nevada. Walker Lake Working Group is a private, not for profit 501(c)(3) organization that uses Walker Lake for fishing, birding, recre-

ation, and for the enjoyment of its scenic beauty. Petitioners complain that Respondents have abrogated their duty to protect and maintain Walker Lake for the benefit of the public and, in doing so, have repudiated their public trust duties.

On July 17, 2000, this court ordered Respondents to file an answer, including points and authorities, against issuance of the writ. Respondents are the State of Nevada, Department of Conservation and Natural Resources; Peter Morros, Director of the Department of Conservation and Natural Resources; and R. Michael Turnipseed, State Engineer.[11] Respondents answered on October 3, 2000.

On October 3, 2000, WRID, Lyon County, and the City of Yerington moved to intervene. WRID was formed in 1919 pursuant to Nevada's Irrigation District Act, enacted the same year. WRID owns, operates, and holds water rights for two reservoirs within the Walker River Basin. Lyon County and the City of Yerington are political subdivisions of the State of Nevada. The motion was granted by this court on November 1, 2000.

On October 13, 2000, Humboldt River Basin Water Authority ("HRBWA") and the City of Fallon filed motions to participate as amicus curiae. HRBWA is a legal entity created by NRS Chapter 277 to ensure the quality and availability of water supplies within the Humboldt River Basin for the mutual benefit of its member counties. The City of Fallon is a political subdivision of the State of Nevada. Their motions were granted on October 18, 2000, and briefs were subsequently filed on their behalf.

On November 13, 2000, the Town of Walker Lake moved to participate as amicus curiae. The Town of Walker Lake is a political subdivision of the State of Nevada. The Town of Walker Lake's motion was granted by this court on November 21, 2000.

On November 14, 2000, Petitioners moved the court for permission to reply. Petitioners' motion was granted on November 21, 2000.

## DISCUSSION

A writ of mandamus is available "to compel the performance of an act" by an inferior state tribunal, corporation, board, or person,[12] but the action being compelled must be one already

---

[11]Since the filing of the petition, Peter Morros has retired from state service. Also, R. Michael Turnipseed has become the Director of the Department of Conservation and Natural Resources, and Hugh Ricci is now the State Engineer.

[12]*See* NRS 34.160; *Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 637 P.2d 534 (1981).

required by law.[13] This court has original jurisdiction to issue writs of mandamus under Nevada Constitution Article 6, Section 4.[14] Generally, mandamus will not issue if petitioner has a plain, speedy, and adequate remedy in the ordinary course of law.[15] However, where circumstances reveal urgency or strong necessity, this court may grant extraordinary relief.[16] Moreover, "where an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction, our consideration of a petition for extraordinary relief may be justified."[17]

Mandamus is an extraordinary remedy which "will not lie to control discretionary action, unless discretion is manifestly abused or is exercised arbitrarily or capriciously."[18] "Even when mandamus is available as a remedy, we are not compelled to issue the writ because it is purely discretionary."[19]

NRS 34.320 defines the writ of prohibition as "the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board or person exercising judicial functions, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board or person." Like the writ of mandamus, it does not serve to correct errors; rather, its purpose is to prevent courts from transcending the limits of their jurisdiction in the exercise of judicial power.[20]

The writ of prohibition is also an extraordinary remedy that is reserved to the sound discretion of the issuing court.[21] The writ may be issued only when there is no plain, speedy, and adequate remedy at law available.[22] While a writ of prohibition is most

---

[13]*State of Nevada v. Gracey,* 11 Nev. 223, 233 (1876).

[14]*See Ashokan v. State, Dep't of Ins.,* 109 Nev. 662, 667, 856 P.2d 244, 247 (1993).

[15]*See State v. Dist. Ct.,* 116 Nev. 953, 11 P.3d 1209 (2000).

[16]*Falcke v. Douglas County,* 116 Nev. 583, 586, 3 P.3d 661, 662-63 (2000).

[17]*Business Computer Rentals v. State Treas.,* 114 Nev. 63, 67, 953 P.2d 13, 15 (1998).

[18]*Round Hill,* 97 Nev. at 603-04, 637 P.2d at 536 (citation omitted).

[19]*State ex rel. Dep't Transp. v. Thompson,* 99 Nev. 358, 361, 662 P.2d 1338, 1340 (1983).

[20]*See State v. Down Et Al.,* 58 Nev. 54, 57, 68 P.2d 567, 568 (1937).

[21]*See Smith v. District Court,* 107 Nev. 674, 677, 818 P.2d 849, 851 (1991); *Walcott v. Wells,* 21 Nev. 47, 24 P. 367 (1890).

[22]NRS 34.330.

often used to restrain courts or judicial tribunals, it can also be used to restrain persons in other classes who are exercising or attempting to exercise judicial or quasi-judicial functions beyond their powers.[23]

Respondents contend that substantially similar litigation, involving nearly identical parties, is currently pending in the United States District Court for the District of Nevada.[24] Respondents also argue that the Decree Court has exclusive jurisdiction to resolve water disputes involving water in the Walker River system and that the language of the Decree Court supports continuing and exclusive jurisdiction.[25]

Petitioners contend that the Decree Court retains exclusive jurisdiction only over private appropriators of the water and that the Decree Court did not address issues relating to the applicability of the public trust doctrine in Nevada. Petitioners argue, therefore, that this court may properly consider their request for relief and issue the writs.

We conclude that the federal court is the proper forum in which to resolve this dispute.

The United States Supreme Court has held that the adjudication of water rights is properly classified as an *in rem* proceeding.[26] Nevada law treats water rights as real property.[27] The general rule is that the first court, whether state or federal, which assumes jurisdiction over real property is entitled to maintain continuing and exclusive jurisdiction over that property.[28]

The Ninth Circuit, in *United States v. Alpine Land & Reservoir Company*,[29] recently addressed a Decree Court's continuing and

---

[23]*See State v. Stevens,* 34 Nev. 146, 116 P. 605 (1911).

[24]As previously discussed, litigation to determine the respective rights to use surface water of the Walker River has been ongoing since 1926. A final decree and order was entered in 1936 and amended by the Ninth Circuit in 1940.

[25]The April 14, 1986, Decree provides, in relevant part:

This decree shall be deemed to determine all of the rights of the parties to this suit and their successors in interests in and to the waters of Walker River and its tributaries.

The Court retains jurisdiction of this cause for the purpose of changing the duty of water or for correcting or modifying this decree; also for regulatory purposes, including a change of the place of use of any water user.

[26]*See Nevada v. United States,* 463 U.S. 110, 143-44 (1983).

[27]*See Application of Filippini,* 66 Nev. 17, 22, 202 P.2d 535, 537 (1949).

[28]*See, e.g., Kline v. Burke Constr. Co.,* 260 U.S. 226, 229 (1922); *Bergeron v. Loeb,* 100 Nev. 54, 58, 675 P.2d 397, 400 (1984).

[29]174 F.3d 1007, 1013 (9th Cir. 1999).

exclusive jurisdiction over previously adjudicated water rights. In *Alpine Land,* the court held that the United States District Court's jurisdiction over the waters adjudicated in a previous water decree were exclusive because of the "complex" and "comprehensive" nature of the previous adjudication.[30] The court further indicated that "to construe these Decrees so that the district court does not retain exclusive jurisdiction would render the retention of jurisdiction a nullity."[31] The court, quoting *Flanagan v. Arnaiz,*[32] went on to say:

> The reason why exclusivity is inferred is that it would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment to the future conduct contemplated by the judgment, yet have a state court construing what the federal court meant in the judgment. Such an arrangement would potentially frustrate the federal district court's purpose.

*Alpine Land.*[33]

Finally, the United States Supreme Court has "recognized that actions seeking the allocation of water essentially involve the disposition of property and are best conducted in unified proceedings."[34]

We conclude that the Decree Court, which has had continuing involvement in the monitoring of the Walker River for more than eighty years, is the proper forum for the redress that Petitioners seek.[35] Moreover, because the Decree involves the allocation of interstate waters between California and Nevada, we believe that a consistent and controlling interpretation by a federal court of competent jurisdiction is more appropriate. In addition, the absence of several interested parties, including the Tribe and the United States, makes the adjudication of water rights among those

---

[30]*Id.*

[31]*Id.*

[32]143 F.3d 540, 545 (9th Cir. 1998).

[33]174 F.3d at 1013.

[34]*Colorado River Water Cons. Dist. v. U.S.,* 424 U.S. 800, 819 (1976) (treating pending state court action as a proceeding *in rem*).

[35]Petitioners contend that the federal court is ill-suited to address the scope of the public trust doctrine in Nevada. In addition, Petitioners argue that if their motion to intervene in the federal court is eventually granted, they will seek to have this court decide the scope of the public trust doctrine pursuant to the federal abstention doctrine. If the federal court reviews this question, it can certify a question regarding the public trust doctrine pursuant to NRAP 5; therefore, the issue need not necessarily be addressed via the extraordinary remedy of a writ.

parties problematic because this court lacks jurisdiction over all the necessary parties.

## CONCLUSION

We conclude that Petitioners have not met their burden of demonstrating that extraordinary writ relief is warranted in this case. Because issuance of the writs is not appropriate, we leave for another day the remaining issues. Accordingly, we deny the petitions.

MAUPIN, C. J., AGOSTI, LEAVITT and BECKER, JJ., concur.

ROSE, J., with whom SHEARING, J., agrees, concurring:

I concur in the majority opinion and its conclusion that the federal decree court is the proper forum to consider the specific relief requested by the petitioners. As we defer to the federal district court, however, I believe that we should affirmatively address the existence and role of the public trust doctrine in the State of Nevada.

In its most fundamental terms, the public trust doctrine provides that, as a matter of federal law, all of a state's navigable waterways are held in trust by the state for the benefit of the people and that a state official's control of those waters is forever subject to that trust.[1] The trust stems from the fact that when Nevada joined the union in 1864, it obtained from the federal government title to all land below the high water mark under the equal footing doctrine of the Statehood Clause of the United States Constitution.[2] The title obtained, however, was not absolute. Instead, as the United States Supreme Court explains:

> [The title] is a title different in character from that which the state holds in lands intended for sale. . . . It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties.[3]

Although the original objectives of the public trust were to protect the public's rights in navigation, commerce, and fishing, the

---

[1]*See Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387 (1892).

[2]*See* Act of March 21, 1864, ch. 36, 13 Stat. 30; *see also Pollard's Lessee v. Hagan,* 44 U.S. 212, 230 (1845) (holding that the land under navigable waters was not granted by the Constitution to the United States, but was reserved to the states, respectively, and that new states have the same rights, jurisdiction, and sovereignty over the soil under navigable water as the original states).

[3]*Illinois Central,* 146 U.S. at 452.

trust has evolved to encompass additional public values—including recreational and ecological uses.[4] Additionally, although the original scope of the public trust reached only navigable water, the trust has evolved to encompass non-navigable tributaries that feed navigable bodies of water.[5] This extension of the doctrine is natural and necessary where, as here, the navigable water's existence is wholly dependent on tributaries that appear to be over-appropriated.

In light of the foregoing authorities, the existence of the public trust doctrine in Nevada appears to be beyond debate. As NRS 533.025 unambiguously states, "[t]he water of all sources of water supply within the boundaries of the state whether above or beneath the surface of the ground, belongs to the public." This court has itself recognized that this public ownership of water is the "most fundamental tenet of Nevada water law."[6] Additionally, we have noted that those holding vested water rights do not own or acquire title to water, but merely enjoy a right to the beneficial use of the water.[7] This right, however, is forever subject to the public trust, which at all times "forms the outer boundaries of permissible government action with respect to public trust resources."[8] In this manner, then, the public trust doctrine operates simultaneously with the system of prior appropriation.

All parties are understandably concerned about the economic impact the lack of water in Walker River or Walker Lake would have on them or their communities. Hawthorne residents are concerned about the loss of a fabulous recreational site, the Paiute Reservation is concerned about keeping sufficient water in Weber

[4]*See Illinois Central*, 146 U.S. at 460 ("[The governing of the public trust] must vary with varying circumstances. The legislation which may be needed one day for the [waterway in question] may be different from the legislation that may be required at another day."); *National Audubon Society v. Superior Court*, 658 P.2d 709, 719 (Cal. 1983) (" 'In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another.' " (quoting *Marks v. Whitney*, 491 P.2d 374, 380 (Cal. 1971))); *In the Matter of Water Use Permit Applications*, 9 P.3d 409, 447 (Haw. 2000) ("The public trust, by its very nature, does not remain fixed for all time, but must conform to changing needs and circumstances.").

[5]*See National Audubon*, 658 P.2d at 721 ("We conclude that the public trust doctrine, as recognized and developed in California decisions, protects navigable waters from harm caused by diversion of nonnavigable tributaries.").

[6]*Desert Irrigation, Ltd. v. State of Nevada*, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997).

[7]*See id.*

[8]*Kootenai Envtl. Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 671 P.2d 1085, 1095 (Idaho 1983).

Reservoir, and the Mason Valley ranchers are worried about sufficient irrigation water for their crops. While the issue today focuses on insufficient water flowing into Walker Lake, which itself is arguably the first actual appropriation, each appropriator may in the future have to worry about his or her water allocation not being sustained as the upstream use continues to absorb a vast majority of the water.

A better approach would be to determine if all appropriators can be accommodated by a plan that will save the essentials of everyone's water needs. This, of course, is what we hope will happen in federal district court. However, a substantial diminution in any natural resource adversely impacts all of us, whether we are water appropriators or not. It is not just the water appropriators who have a vested interest in the water from the Walker River, but every citizen of Nevada as well. It is this water that will dictate whether Walker Lake survives in its present state or becomes a dry lake bed. The stakes at issue go well beyond those who are economically interested in the water from Walker River. The public expects this unique natural resource to be preserved and for all of us to always be able to marvel at this massive glittering body of water lying majestically in the midst of a dry mountainous desert. Chief Seattle wisely observed over a century ago:

> This we know:
> The Earth does not belong to Man,
> Man belongs to the Earth.
> All things are connected,
> like the blood which unites one family.
> We do not weave the web of life,
> We are but a strand in the web of life.
> What we do to the web we do to ourselves.

If the current law governing the water engineer does not clearly direct the engineer to continuously consider in the course of his work the public's interest in Nevada's natural water resources, then the law is deficient. It is then appropriate, if not our constitutional duty, to expressly reaffirm the engineer's continuing responsibility as a public trustee to allocate and supervise water rights so that the appropriations do not "substantially impair the public interest in the lands and waters remaining."[9] "[T]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of pro-

---

[9] *Illinois Central,* 146 U.S. at 452.

tection only in rare cases when the abandonment of that right is consistent with the purposes of the trust.''[10] Our dwindling natural resources deserve no less.

---

[10]*National Audubon,* 658 P.2d at 723.