JAMES R. LAWRENCE, in His Official Capacity as NEVADA STATE LAND REGISTRAR, Appellant, v. CLARK COUNTY, Respondent.

No. 54165

July 7, 2011 254 P.3d 606

*Catherine Cortez Masto*, Attorney General, and *K. Kevin Benson*, Deputy Attorney General, Carson City, for Appellant.

*David J. Roger*, District Attorney, and *Paul D. Johnson*, Deputy District Attorney, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

By the Court, SAITTA, J.:

This appeal concerns whether state-owned land that was once submerged under a waterway can be freely transferred to respondent Clark County, or whether the public trust doctrine prohibits such a transfer. Generally, under the public trust doctrine, a state holds the banks and beds of navigable waterways in trust for the public and subject to restraints on alienability. Although the public trust doctrine has never expressly been adopted in Nevada, this court has previously applied some of its tenets and its existence is implicit in Nevada law.

Thus, in this opinion, we clarify Nevada's public trust doctrine jurisprudence by expressly adopting the doctrine and determining its application in Nevada, given the public's interest in Nevada's waters and the law's acknowledgment of that interest. In so doing, after setting forth the facts and procedural history, we will discuss the development of the public trust doctrine in general, and then its development in Nevada specifically. Next, we will set forth Nevada's public trust doctrine framework, under which we con-

clude that whether the formerly submerged land is alienable, such that it can be transferred to Clark County, turns on the unanswered questions of whether the stretch of water that once covered the land was navigable at the time of Nevada's statehood, whether the land became dry by reliction or by avulsion, and whether transferring the land contravenes the public trust. We thus reverse the district court judgment underlying this appeal, which determined that the disputed land is transferable to Clark County, and we remand this matter for determinations as to whether the disputed land was submerged beneath navigable waters at the time of Nevada's statehood, how it became dry land, and, if necessary, whether its transfer accords with the public's interest in it.

## FACTS AND PROCEDURAL HISTORY

The Nevada Legislature originally enacted the Fort Mohave Valley Development Law (FMVDL) to allow the Colorado River Commission (CRC), an executive state agency, to acquire federal land in the Fort Mohave Valley near Laughlin, within Clark County limits. The FMVDL was recently amended to require the CRC to transfer its Fort Mohave Valley land to Clark County. To effectuate the transfer, the Nevada State Land Registrar, appellant James R. Lawrence, deeded to Clark County the CRC's interest in the Fort Mohave Valley land, except for approximately 330 acres of land adjacent to the Colorado River that he believed was non-transferable under the public trust doctrine, pursuant to which the state must hold the beds and banks of navigable waterways in trust for the public.

In response, Clark County filed a complaint for declaratory relief in district court, seeking an order declaring that Lawrence was required by legislative mandate to transfer the land to Clark County. Lawrence answered the complaint and filed a counterclaim for declaratory relief, seeking a declaration that the disputed land was subject to the public trust doctrine and therefore was not transferable. Clark County filed its answer and a motion for judgment on the pleadings, arguing, among other things, that the Legislature had already determined that the transfer was in the public's interest and that nothing in the federal or state constitutions prohibited the transfer.

Following a hearing on Clark County's motion for judgment on the pleadings, during which the parties debated whether the public trust doctrine applies in Nevada and, if it does, whether the disputed land fell within its purview, the district court determined that the disputed land was not subject to the public trust doctrine because it was not within the current channel of the Colorado River. The district court, therefore, granted Clark County's motion and ordered Lawrence to deed the disputed land to Clark County

within 30 days. Lawrence now appeals. The district court granted a stay of its judgment pending the resolution of this appeal.

## DISCUSSION

### I. Standard of review

Judgment on the pleadings is proper when, as determined from the pleadings, the material facts are not in dispute and the moving party is entitled to judgment as a matter of law. *Bonicamp v. Vazquez*, 120 Nev. 377, 379, 91 P.3d 584, 585 (2004). We review questions of law, including questions of constitutional interpretation and statutory construction, de novo. *See ASAP Storage, Inc. v. City of Sparks*, 123 Nev. 639, 644-45, 173 P.3d 734, 738 (2007); *City of Reno v. Reno Gazette-Journal*, 119 Nev. 55, 58, 63 P.3d 1147, 1148 (2003).

### II. The public trust doctrine's emergence and development

As noted, whether the disputed land is transferable turns on whether it is subject to the public trust doctrine and, if so, how that doctrine applies in Nevada. To answer those questions, we begin with a discussion of the public trust doctrine's origins and development.

#### A. Origins

The public trust doctrine is an ancient principle thought to be traceable to Roman law and the works of Emperor Justinian. *See State v. Sorensen*, 436 N.W.2d 358, 361 (Iowa 1989). Justinian derived the doctrine from the principle that the public possesses inviolable rights to certain natural resources, noting that "[b]y the law of nature these things are common to mankind—the air, running water, the sea, and consequently the shores of the sea." The Institutes of Justinian, Lib. II, Tit. I, § 1 (Thomas Collett Sandars trans. 5th London ed. 1876). He also stated that "rivers and ports are public; hence the right of fishing in a port, or in rivers, is common to all men." *Id.* § 2.

The doctrine was thereafter adopted by the common law courts of England, which espoused the similar principle that "title in the soil of the sea, or of arms of the sea, below ordinary high-water mark, is in the King" and that such title "is held subject to the public right." *Shively v. Bowlby*, 152 U.S. 1, 13 (1894).

#### B. The development of the public trust doctrine in the United States

Courts in this country have readily embraced the public trust doctrine. In 1821, in the first notable American case to ex-

press public trust principles, the Supreme Court of New Jersey observed that citizens have a common right to sovereign-controlled waterways:

> The sovereign power itself . . . cannot, consistently with the principles of the law of nature and the constitution of a well ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people.

*Arnold v. Mundy*, 6 N.J.L. 1, 78 (N.J. 1821).

Thereafter, the United States Supreme Court similarly recognized that "when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use." *Martin et al. v. Waddell*, 41 U.S. 367, 410 (1842).

Fifty years later, in what has become the seminal public trust doctrine case, the Supreme Court decided *Illinois Central Railroad v. Illinois*, 146 U.S. 387 (1892). In *Illinois Central*, the Court noted that because the State of Illinois was admitted to the United States on "equal footing" with the original 13 colonies, it, like the colonies, was granted title to the navigable waters and the lands underneath them. *Id.* at 434. For Illinois, that meant that upon its admission, it held title to its portion of the waters of and lands beneath Lake Michigan. *Id.* at 434, 452. However, the waters and lands underneath Lake Michigan were not freely alienable by the State of Illinois—its title to those areas was "different in character from that which the State holds in lands intended for sale." *Id.* at 452. More specifically, it possessed only "title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties." *Id.* As a result, the Court concluded that the Illinois Legislature's attempted relinquishment of such trust property to the Illinois Central Railroad

> is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. . . . The State can no more abdicate its trust over property in which the whole people are interested than it can abdicate its police powers in the administration of government and the preservation of the peace.

*Id.* at 453.

While the Court noted that such lands need not, under all circumstances, be perpetually held in trust, it recognized that in effecting transfers, the public interest is always paramount, provid-

ing that "[t]he control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." *Id.*

### C. *Nevada's embrace of public trust doctrine principles*

Although Nevada has never expressly adopted the public trust doctrine, our caselaw has adhered to several principles relevant to the existence of the public trust doctrine in this state. The following three cases illustrate that, while the doctrine was not formally adopted, this state has previously embraced the tenets on which it is based.

#### 1. *State Engineer v. Cowles Bros., Inc.*

The first case in which we recognized concepts foundational to the public trust doctrine is a 1970 case, *State Engineer v. Cowles Bros., Inc.*, 86 Nev. 872, 478 P.2d 159 (1970). *Cowles* involved an application with the State Engineer by the owner of "lands adjoining the dry bed of Winnemucca Lake . . . to drill a well on property located in the dry Winnemucca Lake bed." *Id.* at 873, 478 P.2d at 160. In determining whether the State Engineer could permissibly grant such an application, we noted that the state owns the waters and the beds beneath them, based on their navigable status at the time of statehood, providing that

> [w]hen a territory is endowed with statehood one of the many items its sovereignty includes is the grant from the federal government of all navigable bodies of water within the particular territory, whether they be rivers, lakes or streams. If the body of water is classified as non-navigable at the time of the creation of the state, the underlying land remains the property of the United States, but if it is navigable under the definition hereinafter stated, the water and the bed beneath it becomes the property of the state.

*Id.* at 874, 478 P.2d at 160. Thus, *Cowles* set the foundation on which future cases involving public trust doctrine principles rest, by recognizing that navigable waterways are owned by the state.

#### 2. *State v. Bunkowski*

We furthered the application of public trust doctrine principles with respect to state-owned navigable waterways two years later in *State v. Bunkowski*, 88 Nev. 623, 503 P.2d 1231 (1972). In *Bunkowski*, we reiterated " '[i]t is settled law in this country' " that, by virtue of a state's admission into the United States, " 'lands underlying navigable waters within [the] State belong to

the State in its sovereign capacity.'" *Id.* at 627, 503 P.2d at 1233 (quoting *United States v. Holt Bank*, 270 U.S. 49, 54 (1926)). Significantly, we then pointed out that the state holds those lands in trust for its citizens, which prevents the transfer of those lands, absent proper legislative determination:

> It has been held, in what appears to be a majority of cases, that the states hold title to the beds of navigable watercourses in trust for the people of their respective states. Titles to navigable water beds are normally inalienable. In *Alameda Conservation Association v. City of Alameda*, 70 Cal. Rptr. 264 (Cal. App. 1968), it was held that while the state owns land under bays, such lands can be transferred by the state free of trust upon proper legislative determination, citing *People v. California Fish Co.*, 138 P. 79 (Cal. 1913).

*Id.* at 634, 503 P.2d at 1237-38 (citations omitted). In so recognizing, we implicitly acknowledged the public trust doctrine, ultimately concluding that "[t]he State holds the subject lands *in trust for public use.*" *Id.* at 635, 503 P.2d at 1238 (emphasis added). Although we recognized that under certain circumstances the Legislature could alienate public trust lands without breaking the public trust, we did not further elaborate on that concept, apart from indicating that the Legislature must make an "express" and "proper" determination. *Id.* at 634, 503 P.2d at 1237-38. The cases we referenced, however, indicate that legislative conveyances of trust lands must account for the public's interest in maintaining such waterways for their public use. *See, e.g., California Fish Co.*, 138 P. at 88.

### 3. *Mineral County v. State, Department of Conservation*

The most recent case dealing with issues connected to the public trust doctrine, *Mineral County v. State, Department of Conservation*, 117 Nev. 235, 20 P.3d 800 (2001), was an original writ proceeding concerning rights to withdraw surface or groundwater from Walker River and Walker Lake. *Id.* Although this court denied the petition on procedural grounds, Justice Rose issued a concurring opinion expressing his belief that this court should finally "affirmatively address the existence and role of the public trust doctrine in the State of Nevada." *Id.* at 246, 20 P.3d at 807 (ROSE, J., concurring). Citing the seminal Supreme Court case, *Illinois Central*, Justice Rose emphasized that the state holds all land beneath Nevada's navigable waters in trust for the benefit of the state's citizenry, as an incident of Nevada's statehood. *Id.* Justice Rose further asserted that the public trust doctrine in Nevada is contained in NRS 533.025, which provides that "'[t]he water of all sources of water supply within the boundaries of the state whether above or beneath the surface of the ground, belongs to the

public.'" *Id.* at 247, 20 P.3d 808. Regarding NRS 533.025, he wrote:

> This court has itself recognized that this public ownership of water is the "most fundamental tenet of Nevada water law." Additionally, we have noted that those holding vested water rights do not own or acquire title to water, but merely enjoy a right to the beneficial use of the water. This right, however, is forever subject to the public trust, which at all times "forms the outer boundaries of permissible government action with respect to public trust resources." In this manner, then, the public trust doctrine operates simultaneously with the system of prior appropriation.

*Id.* (quoting *Desert Irrigation, Ltd. v. State of Nevada*, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997); *Kootenai Environ. Alliance v. Panhandle Yacht*, 671 P.2d 1085, 1095 (Idaho 1983)).

Justice Rose noted that every Nevada citizen has a vested interest in the water from Walker River and expects the state's natural resources to be preserved. *Id.* at 248, 20 P.3d at 808. Finally, he described this court's vital role of ensuring the continuance of this stewardship:

> If the current law governing the water engineer does not clearly direct the engineer to continuously consider in the course of his work the public's interest in Nevada's natural water resources, then the law is deficient. It is then appropriate, if not our constitutional duty, to expressly reaffirm the engineer's continuing responsibility as a public trustee to allocate and supervise water rights so that the appropriations do not "substantially impair the public interest in the lands and waters remaining." "[T]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust." Our dwindling natural resources deserve no less.

*Id.* at 248-49, 20 P.3d at 808-09 (alteration in original) (quoting *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 452 (1892); *Nat. Audubon Soc. v. Super. Ct. of Alpine Cty.*, 658 P.2d 709, 724 (Cal. 1983)).[1]

---

[1]Our remaining case in the public trust realm, *Pyramid Lake Paiute Tribe v. Washoe County*, 112 Nev. 743, 918 P.2d 697 (1996), did not significantly advance the blueprint of the Nevada public trust doctrine and therefore does not warrant extended discussion. *Pyramid Lake* is noteworthy, however, in that Justice Springer dissented on the ground that the manner in which the State

III. *The sources and functions of the public trust doctrine in Nevada*

With the foregoing discussion in mind, we turn to the parties' arguments regarding the public trust doctrine in this matter. Lawrence argues that this state has adopted the public trust doctrine and, consequently, that the disputed land is not transferable. But as Justice Rose recognized, although Nevada law embraces public trust doctrine principles, this court has never expressly adopted that doctrine. Further, as the caselaw noted above indicates and common sense dictates, the public trust doctrine does not always prohibit the transfer of trust land.

Clark County argues that we should not adopt the public trust doctrine to review the Legislature's conveyances of trust property, because the public trust doctrine is rooted in common law and, thus, cannot supersede legislation. *See, e.g.*, *Gwathmey v. State through Dept. of Envir.*, 464 S.E.2d 674, 682-84 (N.C. 1995) (explaining that, in North Carolina, the public trust doctrine has not been codified in the state constitution, and thus, while the common law doctrine creates a presumption that the state did not transfer public trust lands in a manner inimical to the public trust, the state legislature, as representatives of the people, was free to do so without reservation of any public trust rights). In addition, as it contended during oral argument, Clark County asserts that adopting the public trust doctrine is unwise because, in Clark County's estimation, the doctrine assigns to courts the allegedly impossible task of determining if at any point a given parcel of land was beneath a navigable waterway to ascertain its trust status. In so arguing, however, Clark County fundamentally misapprehends the sources and functions of the public trust doctrine in Nevada and exaggerates the difficulty of determining a land parcel's trust status.

A. *Sources of the Nevada public trust doctrine*

As an initial matter, we note that the public trust doctrine is not simply a common law remnant. Indeed, in addition to the Nevada caselaw discussed above, public trust principles are contained in Nevada's Constitution and statutes and are inherent from inseverable restraints on the state's sovereign power.

---

Engineer was assessing water applications violated the public trust doctrine. *Id.* at 762-63, 918 P.2d at 709 (SPRINGER, J., dissenting). Although we do not necessarily subscribe to Justice Springer's vision of the public trust doctrine, his dissent further demonstrates the existence of the doctrine in Nevada jurisprudence.

### 1. *Public trust doctrine principles in the Nevada Constitution*

Article 8, Section 9 of the Nevada Constitution prohibits the gift or loan of public funds and credit: "The State shall not donate or loan money, or its credit, subscribe to or be, interested in the Stock of any company, association, or corporation, except corporations formed for educational or charitable purposes." Similar provisions in other state constitutions are referred to as gift clauses, as they generally prohibit gifts of taxpayer funds.

In considering Nevada's gift clause, we have stated that transactions disbursing public funds must be struck down if not made for a public purpose. *State ex rel. Brennan v. Bowman*, 89 Nev. 330, 332-34, 512 P.2d 1321, 1322-23 (1973). We have also closely examined such transactions to ensure that the state actually receives valuable benefit. *See Clark County v. Lewis*, 88 Nev. 354, 357, 498 P.2d 363, 365 (1972). Our caselaw stresses the importance of the dispensing state entity reviewing "[a]ll facts, figures and necessary information" when making a dispensation; when the entity has done so, it will not be second-guessed by the courts. *Id.*

Thus, the Legislature's ability to dispose of the public's resources is expressly limited by the gift clause, at the core of which lays the principle that the state acts only as a fiduciary for the public when disposing of the public's valuable property. *See Brennan*, 89 Nev. at 332-34, 512 P.2d at 1322-23; *Lewis*, 88 Nev. at 357, 498 P.2d at 365. The public trust doctrine is based on that same principle upheld by the gift clause: the state must carefully safeguard public trust lands by dispensing them only when in the public's interest. Stated differently, the public trust doctrine, like the gift clause, requires the state to serve as trustee for public resources. We see no reason for treating public trust waterways any differently than public money and credit, insofar as the state must act as trustee to preserve the public's interest in that property. Therefore, we conclude that the constitutional policy contained in the gift clause infers the people's intent to constrain the Legislature's ability to alienate public trust lands as well as public funds.

### 2. *Public trust doctrine principles in Nevada statutes*

Another source of Nevada law that evinces the public trust doctrine is our statutory law, specifically, NRS 321.0005 and NRS 533.025.

NRS 321.0005 provides, in pertinent part:

> The Legislature declares the policy of this State regarding the use of state lands to be that state lands *must be used in the best interest of the residents of this State*, and to that end the

lands may be used for recreational activities, the production of revenue and other public purposes.

(Emphasis added.) Thus, by its express language, NRS 321.0005 contemplates fiduciary-type duties with regard to the state's administration of state lands.

NRS 533.025 provides that "[t]he water of all sources of water supply within the boundaries of the State whether above or beneath the surface of the ground, belongs to the public." Notably, NRS 533.025 does not provide that Nevada's water belongs to the state; rather, it belongs to the public. Thus, as Justice Rose proposed, NRS 533.025 provides grounding for the Nevada public trust doctrine. *See Mineral County v. State, Dep't of Conserv.*, 117 Nev. 235, 247, 20 P.3d 800, 808 (2001) (ROSE, J., concurring). So too does NRS 321.0005. Both provisions recognize that the public land and water of this state do not belong to the state to use for any purpose, but only for those purposes that comport with the public's interest in the particular property, exemplifying the fiduciary principles at the heart of the public trust doctrine. In sum, NRS 321.0005 and NRS 533.025 effectively statutorily codify the principles behind the public trust doctrine in Nevada.

### 3. *Public trust doctrine principles inherent from limitations on the state's sovereign power*

The final underpinning of our formal adoption of the public trust doctrine arises from the inherent limitations on the state's sovereign power, as recognized in *Illinois Central Railroad v. Illinois*, 146 U.S. 387 (1892). In *Illinois Central*, the United States Supreme Court established the principle that "[t]he State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, . . . than it can abdicate its police powers in the administration of government and the preservation of the peace." *Id.* at 453. In other words, because the state holds such property in trust for the public's use, the state is simply without power to dispose of public trust property when it is not in the public's interest. *See id.* ("A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation."); *Kootenai Environ. Alliance v. Panhandle Yacht*, 671 P.2d 1085, 1088 (Idaho 1983) ("[A] state, as administrator of the trust in navigable waters on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties."); *Coxe v. State*, 39 N.E. 400, 402 (N.Y. 1895) ("The title of the state to the seacoast and the shores of tidal rivers is different from the fee simple which an individual holds to an estate in lands. It is not a proprietary, but a sovereign, right; and it has

been frequently said that a trust is ingrafted upon this title for the benefit of the public, of which the state is powerless to divest itself.''). Under the public trust doctrine, the Legislature has the power only to act as a fiduciary of the public in its administration of trust property. The public trust doctrine is thus not simply common law easily abrogated by legislation; instead, the doctrine constitutes an inseverable restraint on the state's sovereign power.

In sum, although the public trust doctrine has roots in the common law, it is distinct from other common law principles because it is based on a policy reflected in the Nevada Constitution, Nevada statutes, and the inherent limitations on the state's sovereign power, as recognized by *Illinois Central*. Accordingly, in the words of Justice Rose, it is ''appropriate, if not our constitutional duty,'' to expressly adopt the doctrine to ensure that the state does not breach its duties as a sovereign trustee, and we do so here. *Mineral County*, 117 Nev. at 248, 20 P.3d at 808 (ROSE, J., concurring). Thus, contrary to the County's position, any legislation that purports to convey public trust lands is subject to judicial review. *See San Carlos Apache Tribe v. Superior Court*, 972 P.2d 179, 199 (Ariz. 1999) (''It is for the courts to decide whether the public trust doctrine is applicable to the facts. The Legislature cannot by legislation destroy the constitutional limits on its authority.'').

B. *Determining whether land is public trust land*

With regard to Clark County's argument that adopting the public trust doctrine unwisely assigns to courts the difficult task of determining if, at any point, a given parcel of land was beneath a navigable body of water in order to determine its trust character, we disagree.

1. *Establishing whether the land was submerged beneath navigable waters*

As an initial matter, the public trust doctrine is rooted in our constitutional and statutory law and inherent limitations on the state's power and, thus, cannot be relaxed simply because it may present courts with difficult factual questions. And in any event, Clark County overstates the complexity of determining the character of land for public trust doctrine purposes.

Determining whether land is held in trust for the public by the state begins by reference to whether the land was submerged beneath navigable water when Nevada joined the United States on October 31, 1864, as Nevada joined the United States on equal footing with other states in every respect, *State v. Bunkowski*, 88 Nev. 623, 628, 503 P.2d 1231, 1234 (1972), and, consequently,

obtained title to all land below the high-water mark of Nevada's navigable waters on the date of its admission to the Union. *See Utah v. United States*, 403 U.S. 9, 10 (1971); *Illinois Central*, 146 U.S. at 434; *Bunkowski*, 88 Nev. at 628, 503 P.2d at 1234. Thus, determining whether land is subject to the public trust does not require consideration as to whether land was at any time underwater, as Clark County claims. Rather, it requires consideration of whether the land was beneath navigable waters on October 31, 1864. *See Bunkowski*, 88 Nev. at 628, 503 P.2d at 1234 (explaining that, for purposes of determining state ownership, the factual question of whether the Carson River is navigable is determined by reference to its condition October 31, 1864). Further, determining the navigability of a segment of a body or channel of water, which under federal law refers to the "ordinary and natural condition of the watercourse," may be accomplished through "expert testimony, historical surveys, and news clippings from the relevant time," as the Arizona Court of Appeals recognized in *Arizona Center for Law v. Hassell*, 837 P.2d 158, 164-65 (Ariz. Ct. App. 1991); *see also State Engineer v. Cowles Bros., Inc.*, 86 Nev. 872, 874, 478 P.2d 159, 160 (1970) ("A body of water is navigable if it is used or is usable in its ordinary condition as a highway of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water." (citing *Brewer Oil Co. v. United States*, 260 U.S. 77, 86 (1922))).

### 2. *Establishing how the land became dry*

If land was beneath navigable waters when Nevada joined the United States, but is now exposed, whether that land remains subject to the public trust doctrine generally depends on the manner in which it became dry—whether by reliction[2] or avulsion.[3] *See Cowles*, 86 Nev. at 875, 478 P.2d at 161. When the exposure is caused by reliction, the gradual and imperceptible exposure of the land, title to the dry water bed is passed to the adjoining shoreland owners. *Id.* The event causing the exposure of the water bed may

---

[2]Reliction is defined as "[a] process by which a river or stream shifts its location, causing the recession of water from its bank." *Black's Law Dictionary* 1404 (9th ed. 2009). A companion concept is accretion. However, reliction differs in that it "is applied to land made by the *withdrawal* of the waters by which it is covered," 93 C.J.S. *Waters* § 177 (2001) (emphasis added), whereas accretion is "[t]he gradual *accumulation* of land by natural forces." *Black's Law Dictionary* 23 (9th ed. 2009) (emphasis added).

[3]Avulsion, as it relates to waterways in the instant context, is "the sudden and rapid change of the channel of the stream which is the boundary, whereby it abandons its old and seeks a new bed." 93 C.J.S. *Waters* § 183 (2001) (footnote omitted).

be considered reliction even when the gradual changes to the water bed come about by artificial means:

> When the exposure is due wholly or in part to artificial causes and those causes are not the act of the party owning the shoreland the rules that prevail as to the ownership of the accreted or relicted land are the same as in the case of accretion or reliction solely by natural causes.

*Id.*

In contrast, when changes to the water bed occur by avulsion, that is, by "sudden changes in the course of a stream," title is not taken away or bestowed. *Peterson v. Morton*, 465 F. Supp. 986, 997 (D. Nev. 1979) (applying Nevada state law), *vacated in part on other grounds by Peterson v. Watt*, 666 F.2d 361, 364 (9th Cir. 1982). Thus, because artificial actions, such as draining, damming, or channeling a waterway, may result in rapid exposure of the water bed, those events are often appropriately considered avulsions. *See id.* at 1003 (determining that where the strip of land in question became dry "as a result of a sudden deliberate and obvious engineering relocation of the waters within the artificial banks of the permanently channelized river," such an event was considered an avulsion under Nevada law and therefore the state retained title to the land); *see also New Jersey v. New York*, 523 U.S. 767, 770-71, 784 (1998) (holding that the federal government's filling of a portion of the Hudson River was an avulsion, and, as a consequence, ownership of the new dry land remained unchanged); *Garrett v. State*, 289 A.2d 542, 546, 548 (N.J. Super. Ct. Ch. Div. 1972) (the filling and rerouting of a tidal stream constituted an avulsion, and accordingly, the state retained title to the streambed).

In *Cowles*, we applied the doctrine of reliction in determining that the state had lost its title to once-submerged land that had gradually and imperceptibly become dry. 86 Nev. at 874-75, 478 P.2d at 161. In the same way, the avulsion doctrine is useful for determining whether the state retains its title to land held in trust for the public after it has become dry. Applying these doctrines balances land gain and loss opportunities in a fair manner and operates as a disincentive to artificially diverting water from public trust lands in an effort to increase personal landholdings near navigable waters. *See id.* at 876-77, 478 P.2d at 162.

Here, whether the disputed land became dry through reliction or avulsion is critical. If it was through reliction, the public trust doctrine does not apply to that land. But if the portion of the Colorado River covering the land was navigable at the time of Nevada's statehood, and the land thereafter became dry through avulsion, the public trust doctrine applies. And if the public trust doctrine applies, whether the disputed land is transferable turns on whether

the transfer serves the public's interest in the land and comports with the state's trustee obligations, as discussed next.

### C. *Determining whether public trust land is transferable*

Resolution of disputes over title to public trust land is a matter of state law. *See Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 484-85 (1988). Thus, state courts considering the public trust doctrine have developed their own frameworks for examining the administration of lands held in public trust. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1082 (D.C. Cir. 1984) ("In this country the public trust doctrine has developed almost exclusively as a matter of state law."). Although several approaches to making a determination regarding the transferability of public trust land exist, the approach taken by Arizona deserves concerted attention, as its constitution contains a gift clause nearly identical to Nevada's.[4] Moreover, Arizona's approach is instructive because it faces many of the same challenges that this state faces in maintaining its public trust property, given its arid desert climate and rapidly expanding urban population. *See* Tracey Dickman Zobenica, *The Public Trust Doctrine in Arizona's Streambeds*, 38 Ariz. L. Rev. 1053, 1054 (1996).

In *Arizona Center for Law v. Hassell*, 837 P.2d 158 (Ariz. Ct. App. 1991), a case with facts and issues remarkably similar to those presented here, the Court of Appeals of Arizona extensively considered the relationship between the public trust doctrine and the Arizona gift clause. In *Hassell*, the Arizona Legislature enacted legislation relinquishing, through an uncompensated quitclaim, the state's claim to any "interest in all watercourses other than the Colorado, Gila, Salt, and Verde Rivers and in all lands formerly within those rivers but outside their current beds." *Id.* at 162. The legislation also allowed "record titleholder[s] of lands in or near the beds of the Gila, Salt, or Verde Rivers" to obtain a quitclaim deed for just $25 per acre. *Id.*

The Arizona Center for Law in the Public Interest and several individuals (collectively, Arizona Center) commenced a lawsuit against Arizona Land Commissioner Milo J. Hassell, the state land department, and the State of Arizona (collectively, Land Commissioner). *Id.* at 163. Arizona Center sought to invalidate the legis-

---

[4]Article 9, Section 7 of the Arizona Constitution provides, in relevant part, that the state "shall [not] ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." While we note that Arizona's gift clause does not include a reference to money like Nevada's gift clause, this textual difference does not have any practical significance as it pertains to the public trust doctrine because both clauses reflect a strong policy limiting the state's ability to dispose of public resources.

lation, alleging that it "violated the gift clause of the Arizona Constitution . . . and the state's sovereign duty to protect the public [interest]." *Id.* (citations omitted). The trial court granted the Land Commissioner summary judgment, determining that "[e]ven if the rivers were navigable at statehood, . . . the state could legally relinquish its claims to the riverbeds for the purpose of 'unclouding title.' " *Id.* Arizona Center appealed. *Id.*

Although the parties in *Hassell* briefed the gift clause and public trust issues separately, the Arizona Court of Appeals considered them in unison. *Id.* at 166. The court explained, "Because the gift clause of the Arizona Constitution explicitly limits governmental freedom to dispose of public resources, it provides an appropriate framework for judicial review of an attempt by the legislative and executive branches to divest the state of a portion of its public trust." *Id.* Relying upon Arizona's gift clause jurisprudence, the *Hassell* court then fashioned the following test for reviewing the validity of dispensations of trust property:

> [W]hen a court reviews a dispensation of public trust property, . . . public purpose and fair consideration[ ] must be shown. . . .
>
> [A]ny public trust dispensation must also satisfy the state's special obligation to maintain the trust for the use and enjoyment of present and future generations.

*Id.* at 170. Applying this test, the *Hassell* court concluded that the legislation being challenged was "invalid under the public trust doctrine and [the gift clause] of the Arizona Constitution." *Id.* at 173.

Because we find the reasoning enunciated in *Hassell* persuasive and harmonious with our own gift clause and public trust jurisprudence, we adopt the *Hassell* approach to reviewing dispensations of public trust property. Accordingly, when assessing such dispensations, courts of this state must consider (1) whether the dispensation was made for a public purpose, (2) whether the state received fair consideration in exchange for the dispensation, and (3) whether the dispensation satisfies "the state's special obligation to maintain the trust for the use and enjoyment of present and future generations." *Id.* at 170. The first two considerations are common to any dispensation of public trust property, *see, e.g., State ex rel. Brennan v. Bowman,* 89 Nev. 330, 332-34, 512 P.2d 1321, 1322-23 (1973); *Clark County v. Lewis,* 88 Nev. 354, 357, 498 P.2d 363, 365 (1972), while the third consideration is specific to navigable waterways under the public trust. *Hassell,* 837 P.2d at 169-70. In addition, cognizant of the fact that public trust land "may . . . undergo[ ] such changes over time that it is no longer

suitable for public trust purposes," *id.* at 170, when reviewing the third consideration, courts should also evaluate the following factors to determine whether a given conveyance comports with the state's trustee duties:

"[T]he degree of effect of the project on public trust uses, navigation, fishing, recreation and commerce; the impact of the individual project on the public trust resource; the impact of the individual project when examined cumulatively with existing impediments to full use of the public trust resource . . . ; the impact of the project on the public trust resource when that resource is examined in light of the primary purpose for which the resource is suited, *i.e.* commerce, navigation, fishing or recreation; and the degree to which broad public uses are set aside in favor of more limited or private ones."

*Id.* at 170-71 (quoting *Kootenai Environ. Alliance v. Panhandle Yacht*, 671 P.2d 1085, 1092-93 (Idaho 1983)). Finally, we note that when the Legislature has found that a given dispensation is in the public's interest, it will be afforded deference. *See id.* at 171; *Lewis*, 88 Nev. at 357-58, 498 P.2d at 365-66. This is not to say that the courts of this state will merely "rubber-stamp" the Legislature's finding. *Hassell*, 837 P.2d at 171. Rather, while courts will give the Legislature due deference, they will carefully examine whether the Legislature made an informed and appropriate conveyance under the rubric set forth above.

## CONCLUSION

We expressly adopt the public trust doctrine in Nevada. We decline, however, to consider in this appeal whether the amended portions of the FMVDL comport with the public trust doctrine, as that determination would be premature.[5] Specifically, whether the

---

[5]The County argues that the amended FMVDL is not within the scope of the public trust doctrine because it does not directly convey the disputed land to a private entity. We cannot agree.

If we were to accept the County's argument, the state could easily use a government subdivision as a conduit to circumvent its trustee duties. *See* 65 C.J.S. *Navigable Waters* § 131 (2010) (explaining that although the state may generally grant public trust land to municipalities, such transfers must be made for a purpose that is consistent with the public trust doctrine); Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 490 (1970) ("When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties."). We therefore conclude that legislation conveying public trust property from the state to a government subdivision is within the ambit of the public trust doctrine and must be analyzed to determine whether such a conveyance results in a violation of the public trust.

land is transferable by the state to Clark County initially turns on whether it was submerged beneath a navigable stretch of the Colorado River at the time of Nevada's statehood, and if it was, whether it became dry through reliction or avulsion. As the district court entered judgment on the pleadings, those material questions of fact remain unanswered. We therefore conclude that judgment on the pleadings was improper, and we reverse the district court's judgment and remand this case to the district court with instructions to evaluate whether the disputed land was beneath a navigable waterway at the time of Nevada's statehood and how it became dry. If, on remand, the district court finds that the disputed land was beneath navigable waters and became dry through avulsion, the district court must then determine whether the portions of the FMVDL conveying those lands to Clark County contravene the public trust.

DOUGLAS, C.J., and CHERRY, GIBBONS, PICKERING, HARDESTY, and PARRAGUIRRE, JJ., concur.